John BOWERS, Albert Cernadas, M. Brian Maher, Anthony Pimpinella, Anthony J. Tozzoli, and Peter F. Vickers, as Trustees for and on behalf of the NYSA–ILA Pension Trust Fund, Plaintiffs,

v.

TRANSPORTES NAVIEROS ECUADORIANOS (TRANSNAVE), Defendant.

No. 88 Civ. 5481 (RJW).

United States District Court,
S.D. New York.

July 27, 1989.

Lambos & Giardino (C.P. Lambos, Donato Caruso, Nicholas G. Maglaras, of counsel), Thomas W. Gleason (Kevin Marrinan, Ernest L. Mathews, Jr., of counsel), New York City, for plaintiffs.

Kirlin, Campbell & Keating (Michael J. Walsh, of counsel), New York City, Kirlin, Campbell & Keating (Robert J. Hickey, of counsel), Washington, D.C., Healy & Baillie (John D. Kimball, Leroy Lambert, of counsel), for defendant.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiffs, the trustees of the NYSA–ILA Pension Trust Fund, brought this action, pursuant to the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461, to collect withdrawal liability payments.[1] In the instant motion, plaintiffs seek interim withdrawal liability payments, pursuant to 29 U.S.C. § 1399(c)(2). In addition, plaintiffs seek liquidated damages in accordance with 29 U.S.C. § 1132(g)(2)(C), interest in accordance with 29 U.S.C. § 1132(g)(2)(B), and attorney's fees and costs in accordance with 29 U.S.C. § 1132(g)(2)(D). For the reasons hereinafter stated, plaintiffs' motion is hereby granted.

## BACKGROUND

Defendant Transportes Navieros Ecuadorianos ("Transnave") is a steamship carrier which has engaged in operations in the Port of New York and New Jersey ("the Port"). In October 1981, Transnave enrolled as a member of the New York Shipping Association ("NYSA") and began paying yearly dues to the NYSA of $150.00. Since its incorporation in 1955, NYSA has acted as the multiemployer bargaining representative for its members (including carriers, stevedores and other employers of longshoremen) in negotiating and administering collective bargaining agreements with the International Longshoremen's Association, AFL–CIO ("ILA"). These collective bargaining agreements, known as the General Cargo Agreement(s) ("GCA"), contain the terms and conditions of longshore employment in the Port.

The GCA established a tonnage assessment on cargo and imposed on carriers an obligation to pay such assessments to the NYSA for the purpose of funding longshore employee benefits. A portion of these assessment revenues is contributed to the NYSA–ILA Pension Trust Fund ("the Fund"). The Fund is the multiemployer pension plan that provides the retire-

---

1. The MPPAA amended the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1368.

ment benefits, prescribed in the GCA, to longshore workers in the Port.

As a member of the NYSA, Transnave paid $1,384,337.17 to the NYSA between 1982 and 1986 in accordance with its assessment obligations. No Transnave vessel has called at the Port since late June, 1987. The Fund determined that Transnave had withdrawn from the plan within the meaning of the MPPAA, and made a demand for withdrawal liability payment, pursuant to 29 U.S.C. §§ 1382, 1399(b)(1). The Fund demanded that Transnave satisfy its withdrawal liability by making quarterly payments of approximately $27,000 for a period of seven years, with the first payment due April 1, 1988. Defendant did not pay any of these assessments, and on August 5, 1988 plaintiffs filed this action.

Defendant argues that it is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), and that service of the summons and complaint was improper. Further, defendant argues that the relief plaintiffs seek, interim withdrawal liability payments, is prohibited by the FSIA. Defendant contends that plaintiffs are not entitled to interim payments by virtue of plaintiffs' failure to abide by the demand and arbitration procedures required by the MPPAA. On the merits, defendant asserts that it is not an employer within the meaning of the MPPAA, and that plaintiffs have not established defendant's liability under the collective bargaining agreement.

## DISCUSSION

The Court will first consider defendant's jurisdictional arguments regarding the FSIA, and will then discuss defendant's procedural and substantive arguments relating to the MPPAA.

### A. *Subject Matter Jurisdiction*

Sovereign immunity is the doctrine of international law under which domestic courts, in appropriate cases, relinquish jur-

isdiction over a foreign state.[2] The FSIA governs the assertion of subject matter and personal jurisdiction over a foreign state. 28 U.S.C. §§ 1602–1611.

> Subject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. The FSIA codifies a restrictive theory of sovereign immunity which confines immunity from suit to a foreign sovereign's public, governmental acts. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 487–88, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). The district courts are endowed with both subject matter and personal jurisdiction over non-jury civil actions against foreign states in which an exception to sovereign immunity is applicable. 28 U.S.C. § 1330(b). When an exception to immunity applies, "the foreign sovereign is liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

There is no dispute that Transnave is a "foreign state" within the meaning of the FSIA. Plaintiffs contend, rather, that the commercial activity exception provided in section 1605 applies, and that Transnave, accordingly, is subject to suit in this Court.

Section 1605(a)(2) provides in part that:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> . . . .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial

---

**2.** Under the FSIA a "'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The distinction between a foreign state and an agency or instrumentality thereof is relevant only for the purpose of determining the proper method of service under section 1608. The immunity provisions of the FSIA apply equally to each kind of entity.

activity of the foreign state elsewhere....

The FSIA defines a commercial activity to include "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Although the determination whether a particular course of conduct constitutes "commercial activity" is often determinative of the outcome of an action brought pursuant to the FSIA, and may sometimes implicate sensitive foreign policy issues when suit is brought against a foreign state, Congress has not provided a precise definition of this term. The courts have a great deal of latitude in determining what constitutes "commercial activity" for purposes of the FSIA. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6615 (hereinafter referred to as "House Rep."). Such determinations are made on a case by case basis, in light of Congress' prescription that "[t]he commercial character of the activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

Congress has emphasized, in the legislative history accompanying the FSIA, that where "an activity is customarily carried on for profit, its commercial nature could readily be assumed." Included among examples of a commercial enterprise is the "employment or engagement of laborers." House Rep. at 16, 1976 U.S.Code Cong. & Admin.News at 6615.

Sailing a ship into a United States port and discharging or receiving cargo constitute commercial activity. *Velidor v. L/P/G Benghazi,* 653 F.2d 812, 819 (3d Cir.1981), *cert. dismissed,* 455 U.S. 929, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982). Even further, defendant retained a company to service its vessels in port, and arranged for longshoremen working out of a United States port to load and unload Transnave's ships while in port. Accordingly, the Court holds that the commercial activities exception to sovereign immunity applies to this action, and the Court has subject matter jurisdiction to hear the action.

**B.  *Personal Jurisdiction***

The jurisdictional provisions of the FSIA provide that:

Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) [providing for subject matter jurisdiction] where service has been made under Section 1608 of this title.

28 U.S.C. § 1330(b). Section 1608 imposes different service requirements, depending whether the party to be served is "a foreign state or political subdivision of a foreign state," on the one hand, or "an agency or instrumentality of a foreign state," on the other.

Absent a special arrangement between the parties, service of process is proper upon a foreign state or a political subdivision thereof only if made in accordance with an applicable international convention, or if sent by mail, return receipt requested, by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned. Service by the clerk of the court must include a translation of each document into the official language of the foreign state. 28 U.S.C. § 1608(a).[3]

Service of process upon an agency or instrumentality of a foreign state is proper if made in accordance with any special arrangement between the parties, in accordance with an applicable international convention, or "by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States." *Id.* § 1608(b).

---

**3.** Section 1608(a) further provides that if service cannot be made within thirty days using the means set forth above, the clerk of the court may send by mail, return receipt requested, the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to the Secretary of State, who is then charged with transmitting the papers through diplomatic channels to the foreign state.

In the instant case, plaintiffs served the summons and complaint upon defendant by personally delivering a copy to Kerr Steamship Company ("Kerr") as defendant's agent.[4] Thus, service was proper pursuant to section 1608(b), so long as defendant is an agency or instrumentality of a foreign state, rather than a foreign state or political subdivision thereof. Defendant argues, however, that it is a political subdivision of the foreign state of Ecuador, and, accordingly, that plaintiffs were required to effect service in accordance with section 1608(a).

The FSIA defines an agency or instrumentality of a foreign state to include any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States ..., nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Defendant contends primarily that it cannot be considered an agency or instrumentality of the foreign state of Ecuador, because it is not "a separate legal person, corporate or otherwise." To support its argument, Transnave points to the governmental decree that created it, which uses the term "enterprise" to describe it.

Reference to the FSIA's legislative history quickly disposes of defendant's argument. The requirement that the entity be a separate legal person "is intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name, contract in its own name or hold property in its own name." House Rep. at 15, 1976 U.S.Code Cong. & Admin.News at 6614. "As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state' could assume a variety of forms." As one example, legislators enumerated "a transport organization such as a shipping line or airline" as an entity that could properly be considered an agency or instrumentality of a foreign state. *Id.*

Defendant in the instant case is a legal entity, first created by Ecuadorian Presidential decree in 1971 ("the 1971 Decree"), and then having the scope of its existence expanded in 1977. It is specially defined by law as the "Ecuadorian State Naval entity, which belongs to the National Armed Forces with Judicial Statute." Exhibit A, annexed to defendant's memorandum, filed February 9, 1989. Its mission is to effect state goals concerning the strengthening of the National Merchant Marine by engaging in commercial maritime and coastal waterway transport, as well as engaging the active participation of Ecuador in worldwide navigation activities. *Id.*

An examination of the 1971 decree reveals several characteristics of Transnave that unequivocally establish Transnave as an entity separate and apart in its management from the Ecuadorian government itself. Transnave has its own assets, independent of those of the Ecuadorian Naval body. It can establish branches or agencies in Ecuador or in foreign territories, join maritime-type organizations and associate with other shipping and foreign companies. It also has its own budget from which it pays employees' salaries. Transnave conducts business in its own name and contracts in it own name. *Id.* It is clear that Transnave is a separate entity and has its own legal existence.

Transnave is "an agency or instrumentality of the foreign state" of Ecuador for purposes of section 1608, and not a "foreign state or political subdivision of a foreign state." Accordingly, service of process was properly effected pursuant to section 1608(b).

---

4. There is ample evidence on the record to support plaintiffs' position that Kerr is indeed an agent of Transnave within the meaning of section 1608, and was authorized to accept service on Transnave's behalf. Defendant has not met its burden to demonstrate that Kerr was not its agent.

■ A determination that service of process upon Transnave was proper does not end the jurisdictional inquiry. The Court must scrutinize, under a due process standard, its power to exercise its authority over a particular defendant. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The commercial activity must bear the requisite nexus to the United States to render the exercise of jurisdiction fair and proper.

It is clear that the activity in question has such necessary ties with the United States. The payments that Transnave has been assessed arise directly from Transnave's operations in a United States port and its engagement of United States longshoremen to load and unload the vessels in the Port. The commercial activity took place in this country; there can be no question that Transnave has substantial contact with the United States.

This court, therefore, may properly assert subject matter jurisdiction over the controversy, and personal jurisdiction over the parties.

C. *The Propriety of Interim Withdrawal Liability Payments as a Remedy Where Jurisdiction is Obtained Pursuant to the FSIA*

In the instant motion, plaintiffs are seeking interim withdrawal liability payments from Transnave, pending a final resolution of the merits of the case. Interim payments are specifically authorized by the MPPAA, which requires employers, upon withdrawing from a plan, to pay whatever share of the plan's unfunded vested liabilities are attributable to that employer's participation.

■ Transnave contends that an order mandating interim withdrawal liability payments is prohibited by the FSIA, which provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution." 28 U.S.C. § 1609. Transnave asserts that such an order is in essence a preliminary injunction, and that preliminary injunctions are prohibited by section 1609.

Transnave is wrong for at least three reasons. First, an order requiring interim withdrawal liability payments is not an injunction. A Court does not draw upon its equitable powers when ordering interim withdrawal liability payments, but merely enforces a statutory right granted to plan sponsors by Congress. *See Korea Shipping Corp. v. New York Shipping Ass'n*, 811 F.2d 124, 126 (2d. Cir.1987) (though order directing interim withdrawal liability payments had the "practical effect" of a preliminary injunction, it was not appealable pursuant to 28 U.S.C. § 1292(a)(1)).[5] Accordingly, an order mandating interim withdrawal liability payments cannot be considered, in essence, a preliminary injunction.

Second, it is not at all clear to the Court that section 1609 prohibits generally the issuance of preliminary injunctions against a foreign state. In *S & S Machinery Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983), the Second Circuit held that the district court had properly dissolved an injunction that prohibited the defendant, an agency of the Romanian Government, from negotiating certain letters of credit that had been issued to it. The injunction was properly dissolved because it had the practical effect of a prejudgment attachment upon the letters of credit, which would be contrary to section 1609. "The FSIA would become meaningless if courts could eviscerate its protections merely by denominating their restraints as injunctions against the negotiation or use of property rather than as attachments of that property." 706 F.2d at 418. Injunctions, then, are prohibited by section 1609 to the extent that they have the effect of an attachment. The relief

---

**5.** In view of the decision of the Second Circuit Court of Appeals in *Korea Shipping*, which operates as binding authority on this Court, the Court declines to follow *Pantry Pride v. Retail Clerks Tri–State Pension*, 747 F.2d 169 (3d Cir. 1984), to the extent *Pantry Pride* may be inconsistent with *Korea Shipping*.

requested by plaintiffs in the instant case will not restrain the use or transfer of any of Transnave's property in this country. Thus, even if an order for interim withdrawal liability payments were properly viewed as an injunction, it would still not be prohibited under section 1609, because it does not have the effect of an attachment.

Third, defendant has failed to address the applicability of any of the several exceptions, set forth in section 1610, to the statutory prohibition against prejudgment attachment. Section 1610(d)(2) provides that:

> The property of a foreign state ..., used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment ..., if—
>
> ....
>
> (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

It appears to the Court that under the facts of this case, section 1610(d)(2) may very well apply. Since no specific property is involved in the relief sought by plaintiffs, the applicability of section 1610(d)(2) is difficult to ascertain. However, since the purpose of the order sought by plaintiffs is to secure satisfaction of a judgment they are seeking against Transnave, the clear language of section 1610(d)(2) seems to permit prejudgment attachment of any of Transnave's property used for a commercial activity in this country. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir.1989) ("[T]he purpose of the injunction is to secure the payment of a judgment which may be rendered in the litigation. Accordingly, Petrobras's property in the United States used for commercial purposes is subject to prejudgment attachment, whether by means of

an injunction or more traditional methods of attachment.").

For all the reasons set forth above, the Court is not persuaded that an order directing the payment of interim withdrawal liability payments is prohibited by section 1609. Accordingly, the Court will consider whether plaintiffs are entitled to interim withdrawal liability payments pursuant to the applicable provisions of the MPPAA.

### D. *Interim Withdrawal Liability Payments*

■ To succeed on a claim for interim withdrawal liability payments, a plan sponsor ordinarily needs to show only that it complied with the MPPAA's procedural requirements. The plan sponsor must: (1) determine that an employer has partially or completely withdrawn from a multiemployer plan; (2) determine the amount of the employer's withdrawal liability; (3) notify the employer of the amount of liability and the payment schedule; and (4) demand payment according to the schedule. *Central States, Southeast and Southwest Areas Pension Fund v. Commercial Cartage Co.*, 1987 Westlaw 10289 at 4 (N.D.Ill. Apr. 24, 1987) (No. 86 C 3268 (JBM)). *See also* 29 U.S.C. §§ 1382, 1399(b)(1).[6] Defendant contends that plaintiffs have failed to comply with the procedural requirements of the MPPAA and accordingly, that they are not entitled to receive interim withdrawal liability payments.

Plaintiffs, by letter dated February 19, 1988, informed Transnave, in care of its agent, Kerr Steamship Company, that due to the cessation of Transnave's activity in the Port, Transnave had been assessed $594,685.00 in withdrawal liability. Plaintiffs set forth a schedule of quarterly payments to begin April 1, 1988, and extending through July 1, 1995, and demanded payment thereof.

■ Defendant argues that the Fund never followed "pre-demand" procedures,

---

6. The employer may then request that the sponsor review any specific matter relating to the determination of the employer's liability and the schedule of payments no later than 90 days after the employer receives notice. 29 U.S.C. § 1399(b)(2)(A). After a reasonable review of the matters raised by the employer, the sponsor

must notify the employer of its decision and the basis for that decision. *Id.* § 1399(b)(2)(B). If the employer still disputes the fact or amount of the determination of withdrawal liability due, the parties must submit the dispute to arbitration. *Id.* § 1401(a).

spoken of in the legislative history of the MPPAA, which provide the employer a reasonable opportunity to (1) identify errors in the determination of withdrawal liability, (2) identify errors in the payment schedule, and (3) furnish the plan sponsor with additional pertinent information. H.R.Rep. No. 869, 96th Cong., 2d Sess. 84, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2952. These procedures, however, were not included in the legislation that was ultimately passed by Congress. The rights of the employer intended to be protected by the pre-demand procedures are adequately secured by other provisions of the MPPAA. Pursuant to 29 U.S.C. § 1399(b)(2)(A), an employer who receives a demand for withdrawal liability payments has the opportunity to confront and question the determination made by the plan sponsor. Accordingly, there is no basis for imposing upon plaintiffs the "pre-demand" procedures that were mentioned in the legislative history of the MPPAA, but which were never enacted into law.

The February 19, 1988 letter in which plaintiffs notified defendant of its withdrawal liability and demanded payment was received by Transnave on February 23, 1988, as indicated by the date on the postal return receipt card.[7] Transnave had 90 days from that date to request review by plaintiffs. 29 U.S.C. § 1399(b)(2)(A).

■ In opposition to the instant motion, defendant raises various substantive arguments against the imposition of interim withdrawal liability payments. Transnave claims that it is not liable for withdrawal payments, because it is not an "employer," within the meaning of 29 U.S.C. § 1381.

Further, Transnave argues that it is not liable because it is not a signatory to the GCA negotiated by the NYSA with the ILA, and because it did not authorize the NYSA to bind it to the agreement. These issues, though, are properly considered only upon final consideration of the merits of plaintiffs' claims, and do not affect plaintiffs' right to receive interim payments.

Section 1399(c)(2) of Title 29 U.S.C. provides that notwithstanding any requests for review or appeal of the plan sponsor's determination of withdrawal liability, payments are due in accordance with the schedule set forth by the plan sponsor, beginning no later than 60 days after the date of demand. Any adjustments are made after final resolution of the dispute.

To withhold the periodic payments required by the MPPAA pending a disposition of defendant's arguments on the merits would frustrate the clear congressional intent behind the requirement of interim payments. *Korea Shipping Corp. v. NYSA–ILA Pension Trust Fund,* 86 Civ. 3428 (EW), slip op. at 1 (S.D.N.Y. Aug. 21, 1986), *appeal dismissed,* 811 F.2d 124 (2d. Cir.1987). Congress enacted section 1399(c)(2) due to its concern with the adverse effects of non-payment of liability upon multiemployer plans. Congress sought to protect those who remain in the fund from additional burdens and losses resulting from employer withdrawals. *Dorn's Transp., Inc. v. I.A.M. Nat. Pension Fund,* 578 F.Supp. 1222, 1232 (D.D.C. 1984) (citing Remarks of Rep. Thompson, 26 Cong.Rec. H7899 (Daily ed., Aug. 26, 1980)), *aff'd without opinion,* 753 F.2d 166 (D.C.Cir.1985). By requiring payment

**7.** Transnave contests the date it received notice and demand regarding its withdrawal liability. Defendant's argument that it should be entitled to discovery on the question of when it received plaintiffs' February 19 letter is not well taken. Such information is solely within defendant's knowledge. Absent a showing to the contrary, this Court will deem the February 19 letter received three days after posting. *Cf.* Rule 6(e), Fed.R.Civ.P.

Defendant's further suggestion that somebody other than Kerr Steamship Company employee Nereida Velez signed for the February 19 letter is wholly unsupported and not warranting belief. Defendant offers the "differing" signature on Ms. Velez's social security card as indicative

that the signature on the postal return receipt card is not hers. The different appearance of two signatures made several years apart does not lead to an inference that one of them is not genuine. If Transnave wished to pursue this argument as a defense, it was obliged to provide evidence, such as an affidavit from Ms. Velez, that properly puts into question the authenticity of the signature on the postal receipt card. Inasmuch as the signature on a postal receipt card is obtained by an employee of the United States Postal Service, it is not at all clear to the Court what inference defendant hopes to draw, even if it were to establish that someone in Kerr's office other than Ms. Velez in fact signed for the letter.

pending appeal, the MPPAA effectuates the avowed purpose of shifting the economic burdens of withdrawal back to the withdrawing employer. *Id.*

Transnave cannot claim that it is a stranger to the Fund. Transnave belonged to the NYSA and made payments over several years pursuant to the GCA, and a portion of those payments were allocated to fulfill Transnave's obligation to the Fund. In no way can it be said that plaintiffs' claims come "out of the blue." *Cf. ILGWU Nat. Retirement Fund v. Levy Bros. Frocks,* 846 F.2d 879, 885–86 (2d Cir.1988) (dispute over withdrawal liability determination must be submitted to arbitration, notwithstanding the defendant's assertion that it was not an "employer" within the meaning of the MPPAA). Accordingly, Transnave is liable for interim payments pending resolution of the merits of the case.

CONCLUSION

Plaintiffs have established that they are entitled to interim withdrawal liability payments. The Fund has followed the requirements set forth by the MPPAA for determining that defendant has withdrawn from the plan, computing defendant's liability, and notifying defendant of such. The statute, supported by case law, makes it clear that pending resolution of the dispute, interim withdrawal liability payments must be made. Defendant is directed to bring its periodic payments up to date by paying plaintiffs the amounts now past due within sixty days of this date, and to make such additional payments as arise when due until final judgment is entered herein.

At oral argument, the parties agreed that the question of plaintiff's entitlement to attorney's fees on the motion had not been adequately briefed. Accordingly, the Court reserves decision on plaintiff's application for liquidated damages, and for attorney's fees and costs.

Settle order on notice.