**Edwena R. HEGNA, et al.**

**v.**

**ISLAMIC REPUBLIC OF IRAN, et al.**

**No. Civ. JFM–03–2050.**

United States District Court,
D. Maryland.

Aug. 25, 2003.

Robert B Kershaw, Ward Kershaw and Minton PA, Baltimore, MD, for Plaintiffs.

Jennifer Ann Paisner, United States Department of Justice, Washington, DC, Thomas M. DiBiagio, Baltimore, MD, for Movant.

## MEMORANDUM

MOTZ, District Judge.

Plaintiffs are members of the family of Charles Hegna, an American who was killed in a Hezbollah terrorist hijacking in 1984. They sued the Islamic Republic of Iran and its agents in the United States District Court for the District of Columbia and obtained a default judgment in the amount of $42,000,000 in compensatory damages and $333,000,000 in punitive damages. In an effort to enforce their judgment, plaintiffs have obtained writs of attachment against two parcels of real property located in Bethesda, Maryland. The United States has filed a motion to quash the writs of attachment. The motion will be granted.

### I.

The properties in question were once occupied by Iranian diplomatic personnel. On November 14, 1979, the properties were blocked by an executive order in response to the taking of the U.S. Embassy and hostages in Tehran. On April 7, 1980, the United States severed diplomatic relations with Iran and the United States took custody of the properties.

On April 14, 1980, the Department of State approved Algeria as the protecting

power for Iranian interests in the United States. (Pakistan now serves that role.) The United States and Iran were unable to reach agreement concerning the return of one another's property to their respective protecting powers. Therefore, the Department of State informed Algeria that the United States would retain custody over the diplomatic and consular properties of Iran. The Department of State also informed Algeria that it would take "all appropriate measures for the safety and protection of such diplomatic and consular premises in the United States."

By a diplomatic note tendered on March 10, 1983, the United States notified Algeria that the United States would continue to respect and protect Iran's diplomatic and consular property pursuant to Article 45 of the Vienna Convention on Diplomatic Relations. The United States also informed Algeria that the United States intended to rent some of the properties in order to protect Iran's interest in them. The United States determined that rental of the properties would further its obligation to protect the properties by keeping them occupied and generating a source of funds that could be used for their maintenance. The United States is currently leasing one of the subject properties to the government of the Netherlands. It is leasing the other property to the government of Peru.[1]

## II.

In November 2002, Congress enacted the Terrorism Risk Insurance Act ("TRIA"). Pub.L. No. 107–297, 116 Stat. 2322. Section 201(a) of TRIA subjects to attachment "the blocked assets" of any terrorist party (defined to include Iran) in connection with the compensatory damages segment of any judgment obtained against that party on a claim based upon an act of terrorism. The issue presented on the present motion is whether or not the subject properties are "blocked assets" of Iran.[2]

■ On its face it would appear that section 201(a) does subject the subject properties to attachment in light of the fact that the properties have been "blocked" by executive order since November 14, 1979. However, the term "blocked assets" as used in section 201(a) is defined to exclude "property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations ... [that] is being used exclusively for diplomatic or consular purposes." Terrorism Risk Insurance Act of 2002, Pub.L. No. 107–297, § 201(d)(2)(B)(ii). It is undisputed that the subject properties are subject to the Vienna Conventions on Diplomatic Relations and Consular Relations. Therefore, the question becomes whether they are "being used exclusively for diplomatic or consular purposes."[3]

1. As delineated in the next section of this opinion, the critical question presented here is whether the subject properties are "being used exclusively for diplomatic or consular purposes" within the meaning of section 201(d)(2)(B)(ii) of the Terrorism Risk Insurance Act. The United States has not advanced (and I will therefore not consider) the argument that the subject properties are used for such purposes by virtue of the fact they are being leased to the governments of the Netherlands and Peru.

2. If TRIA does not subject the properties to attachment, they are otherwise exempt under

the Foreign Sovereign Immunities Act, see 28 U.S.C. § 1609; *Flatow v. Islamic Republic of Iran*, 76 F.Supp.2d 16, 22–23 (D.D.C.1999), and the Foreign Missions Act, see 22 U.S.C. §§ 4305(c) & 4308(f). Plaintiffs concede as much.

3. Plaintiffs rely upon a Congressional Budget Office Report on S.2134, an earlier Senate version of TRIA. This reliance is misplaced since S.2134 did not contain the provision, enacted as section 201(d)(2)(B)(ii) of TRIA, excluding from the definition of "blocked assets" property subject to the Vienna Conven-

That question must be answered in the affirmative. The United States has an international legal obligation under the Vienna Conventions to protect foreign missions, consular premises, and their property in the United States in the event that diplomatic relations between the United States and a foreign country are severed. The conventions recognize that diplomatic properties belong to the state that established them, not to the government that controls the state. The conventions also recognize that host states have the duty to hold in trust for future generations the diplomatic properties of a state with whom they have a dispute, however severe and violent, that has caused the severance of diplomatic relations. As treaties into which the United States has voluntarily entered, the conventions are part of the fundamental fabric of the nation's law. Likewise, the goal of assuring that the United States is in compliance with its treaty obligations is quintessentially "diplomatic." Therefore, in protecting the subject properties the United States clear-ly is using them for a "diplomatic purpose." [4]

■ To exercise sovereign power to take the United States outside of the law of nations would be a solemn act for which there must be strict accountability. If elected officials choose to renounce treaty obligations, their intent must be manifest and their responsibility clear. Thus, "[i]t has been a maxim of statutory construction since the decision in *Murray v. The Charming Betsy*, 6 U.S. 64, 2 Cranch 64, 118, 2 L.Ed. 208 (1804), that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.'" *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982). Perhaps in enacting TRIA some members of Congress did believe they were subjecting Iranian assets to attachment in terrorism cases. However, the language of section 201 as enacted did not unequivocally accomplish that end.[5] To the contrary, section 201 expressly recognized the importance of the

---

tions that "is being used exclusively for diplomatic and consular purposes."

**4.** It is, of course, the United States (not Iran) that is using the subject properties for a diplomatic purpose. Nothing in section 201(a), however, prescribes that it is the state that owns a property that must be using a property for diplomatic purposes in order to exclude the property from the definition of "blocked asset," thus exempting it from attachment.

I also note that the fact that the United States is renting the properties to third parties does not change the analysis in any way. The purpose of the rentals, as was described in the diplomatic note tendered on March 10, 1983 to Iran's protecting power, is to protect Iran's interest in the properties. This purpose was not eviscerated by enactment of section 201(b)(2) of TRIA which excepts from assets that the President may waive from the requirements of section 201(a) "property ... that has been used by the United States for any nondiplomatic purpose (including use as rental property)." Section 201(b)(2) provides

only that if property is rented in pursuit of a nondiplomatic purpose, it cannot be waived by the President from the operation of section 201(a). The section does not necessarily mean, as plaintiffs contend, that the rental by the United States of a foreign government's property is *ipso facto* for a nondiplomatic purpose. Moreover, the waiver provisions of section 201(b) (including the exception from the President's waiver authority contained in section 201(b)(2)) do not come into play unless a property is a "blocked asset" within the meaning of section 201(a) in the first instance. For the reasons I have stated, the properties here in question are not "blocked assets" within the meaning of section 201(a).

**5.** I note that the Department of Justice argues for the interpretation of TRIA I am adopting. That fact alone appears to demonstrate that the language of section 201(d)(2)(B)(ii) is at least ambiguous because the President who signed TRIA into law heads the executive branch of government of which the Department of Justice is a part.

Vienna Conventions in exempting certain foreign assets from subjection to attachment on domestic judgments. By adding a qualifying term requiring that exempted property be "used exclusively for diplomatic or consular purposes," Congress may have skillfully forged a political compromise. But in doing so, it created an ambiguity about the attachability of Iranian assets.

In accordance with precedent established by Chief Justice Marshall in *The Charming Betsy* almost two hundred years ago, the ambiguity must be construed in a manner consistent with our treaty obligations. That was the proper rule of construction for an honorable young nation facing an uncertain future, and it remains the proper rule of construction for a mature, powerful, and confident republic confronting a hostile and dangerous world. We are a nation of law, ennobled by principle, not a people brutalized by hatred or diminished by those who commit grievous wrongs against us.

## AMENDED ORDER

For the reasons stated in the accompanying memorandum, it is, this 25th day of August 2003

ORDERED that the motion to quash plaintiffs' writs of attachment filed by the United States of America is granted.