**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 19, 2004**

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

m 03-10994
m 03-20984

EDWENA HEGNA; INDIVIDUALLY AND AS EXECUTRIX OF
THE ESTATE OF CHARLES HEGNA; CRAIG HEGNA; STEVEN HEGNA;
LYNN HEGNA; PAUL HEGNA,

Plaintiffs-Appellants,

VERSUS

ISLAMIC REPUBLIC OF IRAN;
IRANIAN MINISTRY OF INFORMATION AND SECURITY,

Defendants-Appellees,

UNITED STATES OF AMERICA

Movant-Appellee.

Appeals from the United States District Court
for the Northern District of Texas
and the United States District Court
for the Southern District of Texas

Before SMITH, PRADO, AND PICKERING,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Charles Hegna died at the hands of terrorists who received partial support from the Islamic Republic of Iran. Members of the Hegna family have attempted to collect a default judgment against property previously owned by Iran and currently held by the United States. Based on domestic statutes and international treaties, the two district courts *a quo* quashed writs of attachment and execution issued respectively against two parcels of real property. Finding no error, we affirm both judgments.

## I.
### A.

The Federal Sovereign Immunities Act ("FSIA") articulates the general rule that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. As part of the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress created an exception for state-sponsored terrorist actions. 28 U.S.C. § 1605(a)(7).[1] To be subject to § 1605(a)(7), a nation must be designated as a state sponsor of terrorism. § 1605(a)(7)(A).[2]

The Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, § 2002, 114 Stat. 1464, 1541 (2000), created a regime whereby a party who secured a judgment under § 1605(a)(7) could receive payment from the Secretary of the Treasury. In exchange for that payment, the recipient would relinquish certain rights to collect against the terrorist state.[3]

The Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322 (2002), provided additional rights to parties possessing judgments under § 1605-(a)(7). TRIA states that a successful plaintiff may attach and execute against the "blocked assets"[4] of terrorist parties.[5]

Additionally, TRIA § 201(c)(4) amends the VTVPA by inserting a section describing the procedures the government must follow in the event available funds cannot satisfy all the outstanding requests for payment for § 1605-(a)(7) claims. Although those receiving partial payments do not have to relinquish as many

---

[1] "A foreign state shall not be immune . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources" in aid of a terrorist action. 28 U.S.C. § 1605(a)(7).

[2] The Secretary of State has designated Iran as a state sponsor of terrorism. 49 Fed. Reg. 2836-02 (Jan. 23, 1984).

[3] Additionally, VTVPA § 2002(b)(2) lists the sources of funding for payments arising out of judgments against Iran: "rental proceeds . . . from Iranian diplomatic and consular property located in the United States; and . . . funds not otherwise made available in an amount not to exceed the total of the amount in the Iran Foreign Military Sales Program account within the Foreign Military Sales Fund[.]"

[4] TRIA § 201(d)(2) defines "blocked asset."

[5] "[I]n every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism[,] the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy such judgment . . . ." TRIA § 201(a).

2

rights as they would have forfeited had they received full payment via the VTVPA, the recipients must give up some recovery rights. VTVPA § 2002(a)(2)(C) requires the relinquishment of punitive damages against a terrorist entity, and § 2002(a)(2)(D) prevents parties from executing or attaching property "that is[, *inter alia*,] at issue in claims against the United States before an international tribunal[.]"

Thus, in response to a family member's death, a party may seek a judgment against a state sponsor of terrorism. The party may satisfy such a judgment by seeking and receiving payment under the VTVPA and by attaching and enforcing against "blocked assets" pursuant to the TRIA.

## B.

In 1984, Hezbollah terrorists hijacked a Kuwaiti airliner and diverted it to Tehran, fatally shooting Charles Hegna in the process. In 2001, the Hegna family sought and obtained, pursuant to 28 U.S.C. § 1605(a)(7),[6] a default judgment for $42,000,000 in compensatory damages and $333,000,000 in punitive damages against the Islamic Republic of Iran and the Iranian Ministry of Information and Security.[7]

Relying upon TRIA § 201(a), the Hegnas have attempted to attach and execute against numerous properties that Iran owned at the time of the 1979 hostage crisis.[8] Specifically,

---

[6] Few courts of appeals have considered the application of § 1605(a)(7). *But see Acree v. Republic of Iraq*, 2004 U.S. App. LEXIS 10972 (D.C. Cir. June 4, 2004) (vacating a § 1605(a)(7) award for failing to state a claim); *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004). *Cicippio-Puleo* held:

> [N]either 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment[, which granted punitive damages pursuant to § 1605(a)(7)], nor the two considered in tandem, creates a private right of action against a foreign government. Section 1605(a)(7) merely waives the immunity of a foreign state without creating a cause of action against it, and the Flatow Amendment only provides a private right of
> (continued...)

[6](...continued)
action against officials, employees, and agents of a foreign state, not against the foreign state itself.

*Id.* at 1033.

Although *Acree* and Cipio considered statutes at issue in the current appeal, they involved different circumstances and issues. Both cases considered the validity of the underlying judgment. In the instant matter, neither party contests the validity of the Hegna family's original judgment. Because neither side has briefed the issue or had an opportunity to argue the point diligently, we choose only to address the family's ability to satisfy its judgment against these two particular pieces of property. If the United States wishes to argue the reach of § 1605(a)(7), it may do so in a subsequent case.

[7] *Hegna v. Islamic Republic of Iran*, No. 1:00CV00716 (D.D.C. Feb. 7, 2002).

[8] In the midst of the Iranian revolution of 1979, numerous "students" aligned with Ayatollah Kohmeini took Americans hostage in the American Embassy. The President froze all property and assets of the government of Iran that fell within or would fall within the jurisdiction of the United States. Exec. Order No. 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979). The United States ultimately severed diplomatic and consular relations
(continued...)

they have pursued properties in New York,[9] Illinois,[10] Maryland,[11] and Texas. Additionally, they filed for a payment pursuant to the VTVPA.[12]

Although the two countries promised, as part of the Algiers Accords,[13] to exchange seized consular property, each has retained previously-seized property. Consequently, the United States acts as a custodian of the property that the Hegnas have attempted to attach, and, in every case, has moved to invalidate the family's actions.

In the instant matter, the family attached two pieces of Iranian property located in Texas. One, located in Lubbock, served as a home from which the then-Crown Prince of Iran could receive fighter pilot training.[14] The property located in Houston previously served as the residence of the General Consul of

---

[8](...continued) with Iran. The hostage crisis ended with the signing of the Algiers Accords in January 1981.

[9] *Hegna v. Islamic Republic of Iran*, 299 F. Supp. 2d 229 (S.D.N.Y. 2004). The district court denied the application for attachment based on the conclusion that the Hegnas had relinquished the right to attach the New York property after accepting payment *via* the VTVPA.

[10] *Hegna v. Islamic Republic of Iran*, 2003 U.S. Dist. LEXIS 14039 (N.D. Ill. Aug. 11, 2003). The magistrate judge recommended denying the United States' motion to quash the family's writ of attachment. The Illinois proceedings occurred after the Hegnas had applied for payment pursuant to VTVPA but before payment from the government. Because the Hegnas sought to rescind their application for payment, the magistrate judge recommended staying further proceedings until the resolution of the VTVPA payment issue. As discussed, *infra*, the Hegnas received payments in July and November 2003.

[11] *Hegna v. Islamic Republic of Iran*, 287 F. Supp. 2d 608 (D. Md. 2003). The district court granted the United States' motion to quash the family's writ after concluding that the property at issue fell outside TRIA's definition of "blocked asset."

[12] The Hegnas argue that the Department of the Treasury issued guidelines that *ordered* plaintiffs such as themselves to apply for the VTVPA funds. Because the language of the VTVPA states that the payment regime initiates only "at the person's election," the family's argument warrants slightly more discussion. VTVPA, § 2002(a)(1).

We agree that the Treasury Guideline does not stand as a model of clarity, directness, or help-
(continued...)

[12](...continued) fulness. The notice, however, contains ample language to indicate that a party *may* file for a VTVPA payment and does not indicate that a plaintiff may pursue relief only through the VTVPA.

[13] In part, the Accords established the Iran-United States Claims Tribunal, a nine-member commission charged with resolving "claims of United States nationals against Iran and of Iranian nationals against the United States[;] certain 'official claims' between the two Governments relating to the purchase and sale of goods and services; disputes between the two Governments concerning the interpretation or performance of the Algiers Declarations; and certain claims between United States and Iranian banking institutions." Iran-United States Claims Tribunal Background Information, *available at* http://www.iusct.org/-background-english.html (accessed June 18, 2004).

[14] The Crown Prince received training at Lubbock's Reese Air Force Base, which was closed in 1997.

4

Iran.[15]

With respect to the Lubbock property, the district court granted a writ of attachment and a motion for expedited levy of a writ of execution[16] and scheduled the sale of the property for August 26, 2003. The United States provided an initial VTVPA payment to the Hegnas on July 30, 2003, and filed an emergency motion to void the sale on August 22, 2003. Without providing a written analysis, the district court granted the motion to void the levy and the sale on August 25, 2003.

With respect to the Houston property, the district court issued a writ of execution on November 27, 2002. After the United States moved to quash the writ, the district court referred the matter to a magistrate judge, who, on August 21, 2003, concluded that the property fell within an exclusion to the "blocked asset" definition in TRIA § 201(d)-(2)(B)(ii) and recommended that the district court quash the writ. The district court adopted the recommendations without amendment. The Hegnas appeal the district courts' failure to enforce the original writs of attachment and execution.

## II.

In each case, the district court granted a dispositive motion by terminating the relevant writ. The respective cases, however, present distinct questions of law. With respect to the Houston property, we must determine whether the property fits within the "blocked asset" exclusion in TRIA § 201(d)(2)(B)(ii). With respect to the Lubbock property, we must decide exactly how a partial payment pursuant to VTVPA and TRIA affects a party's ability to collect against non-consular property. We review the district court's legal analyses *de novo*. *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 365 (5th Cir. 2000).

## III.

By requesting and receiving partial payment according to the terms of the VTVPA, the Hegnas relinquished the ability to enforce against the Lubbock property. The parties do not disagree that the Hegnas applied for payment from the Secretary of the Treasury, pursuant to VTVPA § 2002(a)(1),[17] and that they received a partial payment before the sale of the Lubbock property.

The Hegnas challenge the order to quash on three grounds. First, they maintain that the partial payment received on July 30 does not trigger the relinquishment provisions of the amended VTVPA. Second, they assert that any relinquishment may occur only prospectively and cannot apply to property already attached and set for sale. Third, they claim that any possible relinquishment does not apply to the Lubbock property, because such property is not "at issue" before an

[15] Although the two properties are the subjects of two separate actions and are located in different federal judicial districts, we consolidated the matters for argument and disposition. The cases present similar questions regarding the same set of statutes.

[16] The United States unsuccessfully opposed the Hegna family's motion.

[17] Because the Secretary of the Treasury could not make a full payment and gave the family only a partial payment, the amended portions of VTVPA § 2002(d)(5)(A) and (d)(5)(B), apply.

5

international tribunal.[18] To affirm the quashing of the writ of execution, we must agree with the district court on all three matters.[19]

### A.

The Hegnas' acceptance of a partial payment triggered the relinquishment provisions of the VTVPA. Amended VTVPA § 2002(d)(5) states that

[a]ny person receiving less than the full amount of compensatory damages awarded to that party in a judgment . . . shall not be required to make the [relinquishment set forth in previous sections,] except that such person shall be required to relinquish rights set forth – (A) in subsection (a)(2)(C); and (B) in subsection (a)(2)(D) with respect to enforcement against property that is at issue in claims against the United States be-

fore an international tribunal or that is the subject of awards by such tribunal.

The phrase "such person" refers to the individual "receiving less than the full amount of compensatory damages." No other person is referred to in that subsection. Thus, a party receiving partial payment does not have to relinquish his rights to compensatory damages but must give up those rights listed in the two subsections. Subsection (a)(2)(C) concerns punitive damages, and subsection (a)(2)(D) addresses recovery against the "at issue" properties.

The Hegnas would have us draw a line between a partial-partial paymentSSone that falls below the statutorily-defined portion that the government must paySSand a completely-paid partial payment. In essence, the Hegnas contend that they should have received more than the government paid them and that the insufficiency of the amount allowed them to pursue the sale of the Lubbock property.

That theory fails for two reasons. First, the statute does not draw a distinction among types of partial payments, but merely states that "[a]ny person receiving less than the full amount" will relinquish punitive and "at issue" rights. The receipt of any partial paymentSSeven $1SSwould limit the Hegnas' recovery options.

Secondly, the government eventually paid the Hegnas their full share of their proportional payment. The second payment occurred in November 2003. Thus, whatever relinquishment provisions are contained within the partial payment regime apply to the Hegnas.

### B.

---

[18] Specifically, the Hegnas argue that "[u]ntil the matter of the [Iran-United States Claims] Tribunal's subject matter jurisdiction over the Lubbock Property is determined, Iranian properties in the United States, including the Lubbock Property, are simply not property that is 'at issue' before the Tribunal[.]"

[19] Though the amended VTVPA requires a party to relinquish only its general claims for *punitive* damagesSSVTVPA § 2002(a)(2)(C)SSit also mandates relinquishment of *all* claimsSSpunitive or otherwiseSSagainst property "at issue in claims against the United States." § 2002(a)(2)(D). Because the amended VTVPA § 2002(d)(5) expressly states that one receiving less than the full amount of compensatory damages "shall not be required to make the [relinquishment] set forth in subsection (a)(2)(B) or with respect to subsection (a)(2)(D)," a party may continue to pursue compensatory awards. That party, however, may not pursue those awards against "at issue" property. Thus, we must address whether the Lubbock property is "at issue."

6

Although receiving the VTVPA payment causes them to relinquish "all rights" to execute against designated property, the Hegnas advance a creative but questionable argument that they still may sell the Lubbock property. Because payment did not arrive until after the district court attached the property and scheduled a sale, the Hegnas maintain that the sale should proceed.[20] Under this theory, Texas law[21] places the court's levy against the Lubbock property *in custodia legis* and ties all sales proceedings to the date of seizureSSnamely, July 2, 2003.[22]

The Hegnas support this interesting rift in the space-time-continuum by citing a 1927 Fifth Circuit case[23] that concerned bankruptcy and an 1884 Supreme Court opinion[24] that addressed competing judgment liens from Tennessee. These cases do not remotely apply to a situation resembling the instant case.[25]

The family's interesting theory would require the sale to proceed regardless of the correctness of the attachment or the validity of the sale. Courts would not have the ability to alter their rulings in the event of a change in circumstances. The situation, however, did change once the United States made a partial VTVPA payment to the Hegnas.

Because the family members already applied for a payment from the government, they should not argue with the government's attempts to hold them to the terms of the payment. Receipt of the partial payment forced them to relinquish "*all rights* to execute against or attach property that is at issue in claims . . . before an international tribunal[.]" VTVPA § 2002(a)(2)(D) (emphasis added).

Assuming, *arguendo*, that the Hegnas' argument has some validity and that the "right . . . to execute" now lies strictly with the district court, the court certainly possesses the ability to revisit its ruling. A court may "relieve a party or a party's legal representative from a final judgment, order, or proceeding" for a variety of reasons, including the open-

---

[20] The Hegnas contend that, "[s]ince the date of actual sale relates back to the levy date, the date of sale of the Lubbock Property is July 2, 200[3]."

[21] The Hegnas cite the general rule that "[t]he procedure on execution . . . shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable." FED. R. CIV. P. 69(a).

[22] The Hegnas assert that the train toward judicial sale had proceeded past the point of no return: "[W]hen the U.S. Marshal levied on the Lubbock Property[,] the procedure for taking the property into the custody of the District Court was complete . . . . All that remained to be done was the judicial sale, and V[TV]PA's relinquishment provisions have no application to post-levy sales."

Additionally, the Hegnas suppose that they should have the right to pursue sale to satisfy the full value of their judgment against Iran. As shown in part III.A., *supra*, however, even a partial payment triggers the VTVPA's *full* relinquishment provisions.

[23] *Wilkinson v. Goree*, 18 F.2d 455, 456-57 (5th Cir. 1927).

[24] *Freeman v. Dawson*, 110 U.S. 264, 270 (1884).

[25] *Wilkinson* relied on the workings of the former Bankruptcy Act and had no connection to enforcing judgments in Texas. *Freeman* has a similarly non-existent connection.

7

ended "any . . . reason justifying relief from the operation of the judgment." FED. R. CIV. P. 60(b). *See also* FED. R. CIV. P. 59(e) (describing the period of time in which a party must file a motion to alter or amend a judgment).[26]

The Hegnas' theory places form above common sense and above the district court's ability to re-evaluate its ruling before the property is sold. Thus, we turn to whether the Lubbock property fits within the "at issue" language of § 2002(a)(2)(D).

### C.

Because the Lubbock property was "at issue" in a claim before an international tribunal, amended VTVPA § 2002(d)(5)(B) prevents the Hegnas from executing on the property. The United States asserts that the Lubbock property is at issue in the Iran-United States Claims Tribunal ("Claims Tribunal"). In support, the government offers a declaration from Mark Clodfelter, who lists himself as the "Assistant Legal Adviser for, and director of the office of, International Claims and Investment Disputes in the Office of the Legal Adviser of the Department of State."

The Hegnas respond by contending (1) that the property cannot be "at issue" until after a court determines its jurisdiction over the property; and (2) that the Claims Tribunal does not have proper jurisdiction over the property.[27]

In support of their argument, the Hegnas offer a definition from a 1979 edition of BLACK'S LAW DICTIONARY and citations to two Florida state court opinions. "At issue," however, includes a broader swath of conflict than the Hegnas assert. The most recent BLACK'S LAW DICTIONARY (8th ed. 2004) defines "at issue" as "[t]aking opposite sides; under dispute; in question." Although the United States has contested the jurisdiction of the Iran-United States Claims Tribunal over the properties, both matters currently pend before that very body. Even if the government ultimately prevails, the Lubbock property will have remained "at issue" before the tribunal during the instant appeal.[28]

The only question with respect to the "at issue" analysis concerns the evidence that the government has offered. The aforementioned declaration from Clodfelter vaguely but coherently states his familiarity with the Claims Tribunal and that the Lubbock property falls within a list of properties "specifically identified as the subject of the Tribunal case."

Though Clodfelter's declaration could have included more specific information or

---

[26] After the district court granted the motion to void the sale, the Hegnas filed a FED. R. CIV. P. 59(e) motion.

[27] In a related matter, the United States has asserted that consular property should fall under the Vienna Convention on Consular Relations and
(continued...)

[27](...continued)
should not be subject to the Claims Tribunal.

[28] The Claims Tribunal has existed since July 1, 1981, and, as of December 31, 2003, has finalized approximately 3,935 claims. Iran-United States Claims Tribunal Background Information, *available at* http://www.iusct.org/background-english.html (accessed June 18, 2004); Iran-United States Claims Tribunal Quarterly Communique of Jan. 20, 2004, http://www.iusct.org/communique-english.pdf (accessed June 18, 2004). It apparently has not, however, addressed the Lubbock property.

documentary support,[29] the Hegnas did not deny the substance of the declaration in their response, so they are foreclosed from requesting a hearing to offer additional evidence.

Consequently, the Hegna family's acceptance of partial payment triggered the relinquishing provisions of the VTVPA. Because the acceptance required the family to relinquish all rights to attach and execute the judgment, the Hegnas, through the court, cannot sell the property. Finally, because the Lubbock property currently stands at issue before an international tribunal, VTVPA § 2002(a)(2)(D) and (c)(5)(B) prevent the Hegnas from attaching or executing any further judgments against that property.

IV.

The government argues that the VTVPA payment bars the attachment and sale of the Houston property in the same manner as for the Lubbock property. In considering the Houston property, however, the magistrate judge expressly avoided the issues discussed in the analysis of the Lubbock property.[30]

Before we may consider whether the VTVPA blocks collection against the Houston property, we must determine whether the TRIA would allow the Hegnas to attach or execute against the property in the first place. In essence, we must make the same inquiry as did the magistrate judge. Although we may affirm for any reason the record supports,[31] we choose to follow the magistrate judge's analysis.

TRIA § 201(a) empowers an individual who secures a judgment pursuant to 28 U.S.C. § 1605(a)(7) to attach and execute against "blocked assets . . . to satisfy such judgment to the extent of any compensatory damages." Section 201(d)(2) defines "blocked asset" in such a way that it includes the Houston property.[32] Section 201(d)(2)(B)(ii), however, exempts otherwise-attachable property from the "blocked asset" category. To fall within the exemption, the property must satisfy two criteria.

First, the property must be "subject to the Vienna Convention on . . . Consular Relations[.]" TRIA § 201(d)(2)(B)(ii).

---

[29] We wonder why the United States could not have offered some documentation to support Clodfelter's declaration. Presumably, some formal document exists to report the proceedings of the Claims Tribunal. When a family's ability to satisfy a legitimate judgment depends on the status of a piece of property, and when that status requires evidence to make a determination, it is preferable for the government to include more than a declaration from one of its own employees.

[30] "Having determined that Plaintiffs may not execute against the [Houston] property, the court need not reach the issue of whether Plaintiffs have relinquished their right to execute on the judgment
(continued...)

[30](...continued)
based on their acceptance of payment under the VTVPA on July 30, 2003."

[31] *LLEH, Inc. v. Wichita County, Tex.*, 289 F.3d 358, 364 (5th Cir. 2002).

[32] "The term 'blocked asset' means– (A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)[.]" The President froze Iranian property pursuant to the International Emergency Economic Powers Act. *See supra* note 8.

Secondly, the property must be "used exclusively for diplomatic or consular purposes." *Id.* Because we answer both queries in the affirmative, the Houston property does not qualify as a "blocked asset" for purposes of TRIA § 201(a).

## A.

As to the first matter, a consul's residence falls within the sweep of the Vienna Convention on Consular Relations ("VCCR"), April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 8638. The signatories to the VCCR pledge that, if one country severs consular relations with another, the severing countries will "respect and protect the consular premises, together with the property of the consular post and the consular archives" of one another. VCCR, art. 27(1)(a).

The definition of "consular post" includes "any consulate-general, consulate, vice-consulate or consular agency." VCCR, art. 1(1)(a). A consulate typically includes a consul's residence, and no language in the treaty deviates from this norm. BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "consulate" as "the location of a consul's office or residence").

Additionally, the United States has interpreted the VCCR so as to include the Houston property. Not surprisingly, this court has not heretofore considered the VCCR.[33]

We note that the federal courts have long been loathe [*sic*] to involve themselves in matters of foreign policy, preferring to leave such issues to the Executive Branch. Therefore, we have always given

substantial weight to the interpretation of a treaty by the government agency charged with interpreting it.

*More v. Intelcom Support Servs., Inc.*, 960 F.2d 466, 472 (5th Cir. 1992).

The United States, in its brief, "interprets the reference to 'property of the consular post' in Article 27(1)(a) to include real property such as the Consul General's residence at issue here." Although the government certainly could craft a self-serving or opportunistic interpretation, the Hegnas have offered no evidence to suggest such a motivation and have not given a citation to a case or to a compelling opposing argument.

Consequently, the language of the VCCR and the government's reasonable interpreation of that language lead us to conclude that, under the VCCR, the United States has an obligation to "respect and protect" property that served as the residence of the Iranian General Consul. The Houston property is within the ambit of the VCCR.[34]

## B.

Although the government has rented the Houston property to private parties and has used some of those rental proceeds to satisfy domestically-created obligations, it has used

---

[33] The courts that have considered it largely have done so in the context of criminal trials.

[34] The Hegnas also have asserted that the VCCR does not apply, because TRIA applies "Notwithstanding any other provision of law[.]" TRIA § 201(a). The VCCR, however, does not conflict with the TRIA. Instead, TRIA (1) gives parties who have secured judgments against terrorist states a new opportunity to satisfy their judgment; but also (2) attempts to insulate properties subject to international agreementsSSlike the VCCRSSfrom liquidation procedures.

10

the consular residence "exclusively for diplomatic or consular purposes." The Hegnas emphasize the fact of the rental and argue that the government has used the proceeds for a nondiplomatic purpose. The magistrate judge described the two uses of the proceeds generated from renting the former consulate home:

> The funds received from the rentals have been deposited into segregated accounts, with the funds necessary for repairs and maintenance placed in a special Iranian consular account and the excess funds deposited into separate "blocked asset" accounts. Funds in the blocked asset accounts have recently been utilized to compensate victims of terrorism under the VTVPA.

Congress has directed the United States to provide some of its rental proceeds to victims of terrorism. As part of its payment-and-relinquishment regime, the VTVPA designates "rental proceeds accrued on the date of the enactment of this Act from Iranian diplomatic and consular property located in the United States" as a primary source of funding. VTVPA § 2002(b)(2)(A).

The mixed uses of the funds and the fact that some funds have gone to satisfy a domestically-crafted payment regime require us to consider whether the United States has used the Houston property "exclusively" for diplomatic and consular purposes. Two factors ultimately weigh in favor of an affirmative answer.

First, purpose differs from effect or result. The United States may rent the property for the purpose of using the funds to maintain and preserve the property pursuant to the VCCR.

The rental, however, may generate additional revenue that, at Congressional direction, the United States may allocate for other purposes. The Hegnas have not shown evidence regarding the government's intent. Given such a lack of evidence and the government's obligation to "respect and protect" the property pursuant to the VCCR, we are reluctant to impute nondiplomatic motivations to the government's renting of the Houston property.

Secondly, the Hegnas read "diplomatic purpose" too narrowly. Although the United States allocates funds to satisfy VTVPA judgments, and although the payment regime arises from a domestic payment arrangement,[35] the issues certainly concern diplomatic matters.

The United States purportedly has attempted to fulfil the obligations of the VCCR. By not selling the Houston property and by using rental proceeds to carry out routine maintenance, the government "respect[s] and protect[s]" the property presumably for the time when the two countries might resume

---

[35] The entire exchange between Congress and the Executive nicely illustrates the tensions that may develop between governmental actors with different institutional roles. Congress, through AEDPA and TRIA, has attempted to provide greater opportunities for victims of terrorism to collect on judgments against the states that sponsor and support such actions. By exempting properties subject to international tribunals and treaties such as the VCCR, VTVPA and TRIA acknowledge the Executive's general power to administer diplomatic affairs. U.S. CONST. art. II, § 2(2). The Executive has taken full advantage of the congressional exception.

diplomatic and consular relations.[36]

The Executive Branch has simultaneously attempted to compensate parties harmed as a result of Iran's support of terrorism and to administer consular property in accord with the VCCR. By maintaining the property, the United States has used the former General Consul's residence within the terms of the TRIA exclusion. Consequently, the district court did not err in its determination that the Houston property fell outside the definition of a "blocked asset" and did not err in its grant of the United States' motion.

V.

Consequently, the district courts did not err by quashing the writs of attachment and execution. By applying for a payment under the VTVPA, the Hegnas agreed, on receipt of a partial payment, to relinquish the right to execute against Iranian property "at issue" before bodies such as the Iran-United States Claims Tribunal. The Lubbock property fits that description. Additionally, although Congress gave families of terror victims greater rights to satisfy their judgments, it expressly exempted consular property such as that located in Houston.

Based on the regime that Congress has enacted and that the Executive has implemented, the Hegnas cannot satisfy their otherwise proper and valid judgment and cannot collect against the property involved in this case. If some injustice exists, those two bodies have the responsibility to correct it.

The judgments at issue are AFFIRMED.

---

[36] If, in accordance with the Hegnas' theory, the United States risks exposing consular property to attachment and sale whenever it uses any rental proceeds to pay a judgment pursuant to the VTVPA, it may merely choose not to use any rental proceeds to satisfy any judgments against terrorist states. The government would still use the property for a diplomatic or consular purpose, but families seeking recovery under the VTVPA would have fewer sources of proceeds with which to satisfy their judgments.

12