In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-4294

EDWENA A. HEGNA, individually and as
executor of the Estate of CHARLES HEGNA,
deceased, CRAIG HEGNA, STEVEN HEGNA, et al.,

*Plaintiffs-Appellants*,

*v.*

ISLAMIC REPUBLIC OF IRAN and IRANIAN
MINISTRY OF INFORMATION AND SECURITY,

*Defendants*,

and

UNITED STATES OF AMERICA,

*Movant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 8643—**Suzanne B. Conlon**, *Judge.*

———————

ARGUED MAY 27, 2004—DECIDED AUGUST 11, 2004

———————

Before FLAUM, *Chief Judge*, and MANION and KANNE,
*Circuit Judges*.

FLAUM, *Chief Judge*.  Edwena A. Hegna, Craig Hegna,
Lynn Marie Hegna Moore and Paul Hegna, the plaintiffs-
appellants, are the wife and children of Charles Hegna, an

American who was murdered during a 1984 terrorist hijacking of a Kuwaiti Airlines flight. The hijacking was undertaken by Hezbollah, a terrorist group sponsored by the Islamic Republic of Iran and the Iranian Ministry of Information and Security (collectively "Iran"). The appellants brought suit under 28 U.S.C. § 1607(a)(7) against Iran in the United States District Court for the District of Columbia seeking money damages for the death of Charles Hegna. The district court entered a default judgment in January 2002 in the amount of $42 million in compensatory damages and $333 million in punitive damages.

The Hegnas registered the judgment in the United States District Court for the Northern District of Illinois in November 2002. In January 2003, the Hegnas obtained writs of attachment seeking the levy and sale or turnover of two condominium units owned by the Iranian government located at 155 N. Harbor Drive in Chicago, Illinois ("Chicago properties") in aid of execution of the judgment. The condominiums are currently in the custody of the United States government. After the Hegnas moved for a turnover order to obtain title to the properties, the United States moved to quash the writs of attachment. In December 2003, the district court granted the government's motion, and the Hegnas now appeal. We affirm the judgment of the district court for the reasons stated herein.

## I. Background

In 1996, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress amended the Federal Sovereign Immunities Act ("FSIA") to create an exception to sovereign immunity for state-sponsored terrorist acts. *See* 28 U.S.C. § 1605(a)(7) (providing that a "foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which money damages are sought against a foreign state for personal injury or death

that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources"). The exception applies only if the foreign state had been designated as a state sponsor of terrorism when the terrorist act occurred or was so designated as a result of the act that caused the injury. *See* 28 U.S.C. § 1605(a)(7)(A). Former Secretary of State George Schultz designated Iran as a state sponsor of terrorism on January 23, 1984.

On December 4, 1984, members of the aforementioned Hezbollah hijacked a Kuwaiti Airways aircraft bound for Pakistan. One of the passengers on the plane was Charles Hegna, an American citizen employed by the United States Agency for International Development. The terrorists ultimately forced the pilot to land at Iran's Tehran airport. Thereafter, the terrorists fatally shot Mr. Hegna and threw his body from the plane.

Mr. Hegna's wife and children brought suit against Iran in April 2000 under 28 U.S.C. § 1605(a)(7) seeking compensation for his murder. The Iranian government defendants did not appear, and in January 2002 the district court entered a default judgment in the amount of $42 million in compensatory damages and $333 million in punitive damages. *Hegna v. Islamic Republic of Iran*, No. 1:00CV00716 (D.D.C. Feb. 7, 2002) (amended order and judgment).

Until November 2002, the Hegnas had no means for enforcing the judgment against Iran. At that time, Congress enacted § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, § 201, 116 Stat. 2,322, 2,337 (codified at 28 U.S.C. § 1610 note). TRIA subjects a class of Iran's property in the United States to execution and attachment in aid of execution. Section 201(a) of TRIA states:

> Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a

terrorist party on a claim based upon an act of terror-ism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attach-ment in aid of execution in order to satisfy such judg-ment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 note. "Blocked asset" is defined by TRIA as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). Expressly excluded from the definition of a "blocked asset" is "property subject to the Vienna Convention on Consular Relations . . . that . . . is being used exclusively for . . . consular purposes." *See* TRIA § 201(d)(2)(B).

Five years prior to Mr. Hegna's murder, President Carter had responded to the 1979 Iran hostage crisis by issuing Executive Order 12170 pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, blocking all property and interests in property of the Government of Iran subject to the jurisdiction of the United States. Exec. Order No. 12170, 44 Fed. Reg. 65,729 (Nov. 15, 1979). Despite Executive Order 12170, the United States permitted Iran to continue to occupy its diplomatic and con-sular properties until April 7, 1980, when the President severed diplomatic and consular relations with Iran and ordered Iranian diplomatic and consular officials to leave the United States. Since that time, all of the Iranian diplo-matic and consular properties located in this country have been in the custody of the United States government pursuant to the United States' obligation under Article 27

of the Vienna Convention on Consular Relations and Article 45 of the Vienna Convention on Diplomatic Relations to "respect and protect" the property of the consular and diplomatic posts following the severance of diplomatic relations. The properties have been maintained by the Office of Foreign Missions of the United States Department of State since 1982 pursuant to the Foreign Missions Act, 22 U.S.C. § 4305(c)(1).[1]

Invoking TRIA § 201(a), the Hegnas sought to recover on their § 1605(a)(7) judgment by executing against and attaching certain blocked properties of Iran, including the Chicago properties.[2] Prior to the 1980 severance of consular relations between the United States in Iran, the Chicago properties had been used as residences by employees of the Consulate of Iran. The Hegnas obtained writs of attachment on January 21, 2003 from the United States District Court for the Northern District of Illinois seeking the levy and sale or

---

[1] As is discussed further in the body of this opinion, the United States' custody of the Chicago properties is the subject of a claim before the Iran-United States Claims Tribunal at the Hague ("Claims Tribunal"). The Claims Tribunal was established on July 1, 1981 by the Algiers Accords, an international agreement comprised by five documents. The Algiers Accords set forth the respective obligations of the United States and Iran following the severance of diplomatic and consular relations.

[2] For the purposes of this appeal, we need not decide whether these properties are "blocked assets" within the meaning of TRIA § 201(d)(2).

turnover of the Chicago properties.[3] Iran did not appear to defend the action.

In addition to pursuing attachment and execution of the Chicago properties in aid of execution of their judgment, the Hegnas also pursued relief under the Victims of Trafficking and Violence Protection Act ("VTVPA"), Pub. L. No. 106-386, § 2002(a)(2)(A), 114 Stat. 1,464, 1,542 (2002), *amended by* TRIA § 201(c)(1). Section 2002 authorized the Secretary of the Treasury to buy judgments from judgment-creditors of Iran and Cuba. These payments by the United States were intended to provide judgment-creditors an alternative to enforcing their § 1605(a)(7) judgments against Iran. VTVPA § 2002(a) provided judgment-creditors the option of collecting either 110 percent or 100 percent of the amount of compensatory damages that they had been awarded on a § 1605(a)(7) claim, in exchange for the relinquishment of certain rights to enforce their judgments. All judgment-creditors who collected payment under § 2002 had to "relinquish[ ] all claims and rights to compensatory damages and amounts awarded as judicial sanctions." § 2002(a)(2)(B). Addition-

---

[3] The Hegnas have also pursued the attachment of properties in New York, Maryland, and Texas. *See*, *respectively*, *Hegna v. Islamic Republic of Iran*, 299 F. Supp. 2d 229 (S.D.N.Y. 2004) (denying the Hegnas' application for attachment); *Hegna v. Islamic Republic of Iran*, No. 03-2159 (4th Cir. July 14, 2004) (holding that the writs of attachment at issue were properly quashed because the Hegnas' acceptance of partial payment from the United States effected a relinquishment of all rights to execute against or attach tribunal property); *Hegna v. Islamic Republic of Iran*, Nos. 03-10994, 03-20984 (5th Cir. July 19, 2004) (holding that the writ of execution against one property was properly quashed because the Hegnas' acceptance of partial payment from the United States effected a relinquishment of their right to attach against tribunal property, and that the writ of execution against the other property at issue was properly quashed because the property was not a "blocked asset" within the meaning of TRIA § 201(d)(2)(B)(ii)).

ally, those creditors who elected to collect 110 percent of compensatory damages awarded were required to further relinquish "all claims and rights to punitive damages awarded in connection with such claim." § 2002(a)(2)(C). Lastly, those who elected to collect 100 percent of compensatory damages awarded were required to "relinquish[ ] all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal . . . ." § 2002(a)(2)(D).

As originally enacted, § 2002(a)(2)(A)(ii) provided for payment to a limited group of judgment-creditors, and at that time, the Hegnas were not statutorily eligible for compensation. The TRIA amendments to § 2002 expanded eligibility for payment to § 1605(a)(7) judgment-creditors of Iran who had filed suit before October 28, 2000. *See* TRIA § 201(c)(1) (amending VTVPA § 2002(a)(2)(A)(ii)). The Hegnas were thus eligible for payment. Recognizing that the funds allocated for making payments under § 2002 might be inadequate to cover the full amount of compensatory damages awarded to each of the newly eligible judgment-creditors, TRIA § 201(c)(4) authorized partial payment to judgment-creditors on a pro rata basis, to be calculated in proportion to the amount of compensatory damages awarded to each claimant. *See* TRIA § 201(c)(4) (amending VTVPA § 2002(d)(1)). In light of the possibility that these judgment-creditors might collect only a pro rata payment, TRIA excused these judgment-creditors from the preexisting VTVPA § 2002 requirement that they forgo other attempts to collect compensatory damages owed on the judgment. *See* TRIA § 201(c)(4) (amending VTVPA § 2002(d)(5)). However, in exchange for receiving a pro rata payment in an amount "less than the full amount of compensatory damages awarded," the newly eligible judgment-creditors were required to relinquish their rights to collect punitive damages and to enforce their judgments "against property that is at issue in claims against the United States

before an international tribunal." *See* TRIA § 201(c)(4) (amending VTVPA § 2002(d)(5)(A), (B)).

On or about March 20, 2003, the Hegnas applied for payment under VTVPA § 2002(a)(2)(A)(ii), as amended by TRIA § 201(c)(1). In doing so, they were required to submit documentation to the Office of Foreign Assets Control ("OFAC") of the Department of Treasury describing "all ongoing attachment and/or execution proceedings relating to the [outstanding] judgment." Payments to Persons Who Hold Certain Categories of Judgments Against Cuba or Iran, 68 Fed. Reg. 8077, 8078 (Feb, 19, 2003), (available at 2003 WL 354372). As discussed above, the Hegnas had obtained writs of attachment seeking the levy, sale, or turnover of the Chicago properties two months prior to submitting their application, and they informed OFAC of the pendency of those proceedings in their applications. Additionally, the OFAC application required the Hegnas to submit the following disclosures regarding their statutory relinquishment of rights in the event of a pro rata payment:

> In the event that . . . the payment that I receive will be less than the full amount of compensatory damages awarded to me . . . I hereby relinquish (1) all rights and claims to punitive damages awarded in connection with the claim or claims I brought under 28 U.S.C. 1605(a)(7) . . . and (2) all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal or that is the subject of awards by such tribunal. I understand that the relinquishment that I make in the event of any pro rata distribution is irrevocable once the payment is credited to the bank account I have identified in this application . . . .

*Id.*

While the Hegnas' applications for payment from OFAC were pending, they continued to pursue relief through the

attachment of the Chicago properties. After the district court issued writs of attachment seeking the levy and sale or turnover of the Chicago properties, the matter was referred to a magistrate judge. On April 21, 2003, shortly after applying for payment from OFAC, the Hegnas moved for a turnover order to obtain title to the properties. The United States appeared pursuant to 28 U.S.C. § 517 and moved to quash the writs of attachment. The United States argued that the Chicago properties were not subject to attachment under TRIA § 201(d)(2)(B)(ii), because that section exempts from the definition of "blocked asset" "property subject to the . . . Vienna Convention on Consular Relations . . . that . . . is being used exclusively for . . . consular purposes."

While the matter was pending before the magistrate judge, OFAC responded to the Hegnas' applications for payment. In June 2003, following the receipt of the Hegnas' applications and disclosures, R. Richard Newcomb, the Director of OFAC, sent a letter to them reiterating that their statutory relinquishment of rights would "take[ ] effect on the date upon which OFAC issues a pro rata payment." On or about July 30, 2003, the Hegnas collected the first installment of their partial payment under VTVPA.[4] A few days later, on August 11, 2003, the magistrate judge recommended that the United States' motion to quash the writs of attachment be denied, but the turnover order stayed pending resolution of *Hegna et al. v. Snow*, No. 03-1479 (D.D.C.). Also on August 11, 2003, the United States filed a supplemental memorandum before the magistrate judge arguing that the Hegnas had relinquished their rights to attach the Chicago properties upon receipt of the VTVPA payments, by operation of the relinquishment provisions of the amended § 2002(d)(5). The United States urged that the Chicago

---

[4] The Department of the Treasury furnished the Hegnas with the remainder of their proportionate share on November 13, 2003.

properties were at issue before an international tribunal, and that the Hegnas' receipt of VTVPA funds had therefore precluded them from attaching those properties in aid of execution of their § 1605(a)(7) judgment. The district court agreed with the United States and dismissed the enforcement action on the ground that the Hegnas had relinquished their rights to attach the Chicago properties in aid of execution of their judgment. *Hegna v. Islamic Republic of Iran*, No. 02 C 8643 (N.D. Ill. Dec. 3, 2003) (order dismissing enforcement action with prejudice). The district court quashed the writs of attachment on December 5, 2003, and this appeal followed.

## II. Discussion

The Hegnas challenge the district court's order quashing the writs of attachment on the Chicago properties, arguing that district court erred in concluding that the receipt of payment pursuant to VTVPA § 2002(d)(1) (as amended by TRIA § 201(c)(4)) forced a relinquishment of their rights to pursue attachment remedies against the Chicago properties. We review the district court's determinations of law de novo. *See Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004).

The Hegnas present several arguments in attempts to persuade this Court that the statutory relinquishments have no application to their pursuit of the attachment and execution of the Chicago properties. We begin with the Hegnas' argument that the application of the statutory relinquishments is solely prospective in nature. According to the Hegnas, their pre-July 30, 2003 efforts to attach the Chicago properties could not be defeated by their collection of payment on that date; that is, they believe that, so long as they had begun the process of attaching property prior to the actual receipt of funds from the Department of Trea-

sury, the receipt of those funds is irrelevant to the completion of the attachment and execution process.

The Hegnas' argument conflicts with the language of VTVPA § 2002(a)(2)(D), and for that reason, it must be rejected. The amended VTVPA § 2002(d)(5) incorporates the requirement set forth in § 2002(a)(2)(D) that an applicant "relinquish[ ] *all* rights to execute against or attach property that is at issue in claims against the United States before an international tribunal . . . ." *See* VTVPA § 2002(d)(5)(B), (as amended by TRIA § 201(c)(4)) (emphasis added). The word "all" communicates that no right to execute or attach property survives the acceptance of payment, regardless of when the claimant initiated the attachment process.

However, the Hegnas argue that their July 2003 acceptance of partial payment could not supercede their efforts to obtain the Chicago properties because their interest in the properties had already been perfected by that time. Citing Federal Rule of Civil Procedure 69(a), the Hegnas urge that Illinois execution procedure governs the attachment and execution of the Chicago properties. *See* Fed. R. Civ. P. 69(a) (directing that execution proceedings "shall be in accordance with the practice and procedure of the state in which the district court is held . . ."). Analogizing to Illinois law of personal property, the Hegnas argue that a lien "is considered perfected as of the date of service of the citation." *See Cacock v. Covington*, 11 F.3d 52, 54 (7th Cir. 1997). The Hegnas urge that after the U.S. Marshal returned the writs of attachment on January 27, 2003, the levy was complete, the Chicago properties brought into the custody of the district court, and the levy was not subject to defeat by any subsequent events.

This theory must fail. Despite the Hegnas' perfection of their interest in the Chicago properties, no turnover order had issued; their interest remained open to challenge while the motion for turnover was pending in the district court.

*See 100 W. Monroe Partnership v. Carlson*, 319 Ill.App.3d 761,769 (Ill.App. 1 Dist. 2001) ("A citation lien remains subject to attack and modification until the turnover order. It is the turnover order which makes the lien irrevocable."). In ruling on the Hegnas' motion to turnover the Chicago properties, the district court was required by Federal Rule of Civil Procedure 69 to enforce applicable federal law. *See* Fed. R. Civ. P. 69 (providing that federal law is to govern execution proceedings "to the extent that it is applicable"). In this case, the relinquishments set forth in § 2002(a)(2)(D) (as amended by TRIA § 201(c)(4)) were directly applicable, and those relinquishments required the defeat of the Hegnas' efforts to execute the Chicago properties, regardless of the effect of the levy under Illinois law. After the Hegnas accepted partial payment under the amended § 2002, the ongoing attachment proceedings were rendered moot.

Next, the Hegnas argue that § 2002(a)(2)(D) precludes only efforts to "execute against or attach [tribunal] properties," but does not intend to preclude the post-levy sale or turnover of those properties. Under this theory, the Hegnas would have us believe that Congress intended to allow one type of execution proceeding—the post-levy sale—while precluding all others. The policy behind § 2002(a)(2)(D) does not support the Hegnas' reading of the statute. The payments offered by the amended § 2002 are to serve as a substitute, rather than as a supplementary, method for the collection of compensatory damages awarded in § 1605(a)(7) lawsuits; for that reason, § 2002(a)(2)(D) requires the relinquishment of "*all* rights to execute against or attach property" (emphasis added). To read a "post-levy execution" exception into the § 2002(a)(2)(D) relinquishment would be to detract from its purpose, that is, to demand a relinquishment of all rights to attach certain property in exchange for collection of funds from the United States. In the case that judgment-creditors receive only partial payment, they may continue to pursue outstanding compensatory damages by methods other than

executing against tribunal property, *see* VTVPA § 2002(d)(5) (as amended by TRIA § 201(c)(4)), but the plain language of the statute compels the relinquishment of the right to pursue all forms of execution against tribunal property, including the post-levy turnover of such property.

The Hegnas also argue that this Court should view the magistrate's August 11, 2003 recommendation to deny the United States' motion to quash the writs of attachment as if it had been granted prior to their July 2003 receipt of partial payment from the Department of Treasury. The Hegnas argue that, had the United States appeared to contest the attachment of the Chicago properties soon after the January 2003 writs of attachment were issued, instead of waiting until April 24, 2003 to do so, then the magistrate likely would have recommended a turnover order prior to Hegnas' July 30, 2003 receipt of payment. Additionally, they contend that the United States failed to prove before the district court that the recommended stay of the turnover order was merited; therefore, they argue, this Court should consider the magistrate's recommendation for a turnover order as if there had been no suggested stay of that order. In their view, the district court should have granted a *nunc pro tunc* order, to predate the turnover order.

A *nunc pro tunc* order is granted only in extreme cases, when "a court has spent an undue amount of time deliberating and thereby has caused the parties prejudice or harm." *Transamerica Ins. Co. v. South*, 975 F.2d 321, 326 at n.2 (7th Cir. 1995). The circumstances presented by this case do not merit the operation of the doctrine of *nunc pro tunc*. "As this court stated in *King v. Ionization International, Inc.*, 825 F.2d 1180, 1188 (7th Cir. 1987), '[t]he office of a *nunc pro tunc* ('now for then') order is to clean up the records by showing what was previously done with effect from the time done; it is not to alter substantive rights.'" *Transamerica*, 975 F.2d at 325. In this case, the district court ultimately rejected the magistrate's recommendation for a turnover order. Even

if the magistrate's August 11, 2003 recommendation and report had suggested that the turnover order be issued immediately, rather than stayed, the district court would have rejected the suggestion. The district court's order quashing the writs of attachment was premised on the Hegnas' July 30, 2003 acceptance of partial payment, an event which predated the magistrate's recommendation. The Hegnas ignore the effect that this payment had on their substantive rights under TRIA to attach certain properties. To argue for a *nunc pro tunc* order is to ask this Court to turn a blind eye to the consequences of that July 30, 2003 payment.

Lastly, the Hegnas argue that relinquishment is conditioned upon receipt of the claimant's entire proportionate share. They urge that their receipt of partial payment in July 2003 was insufficient to work a relinquishment of their rights under VTVPA § 2002(d)(5)(B) (as amended by TRIA § 201(c)(4)). We disagree. The amended § 2002(d)(5) provides for relinquishment of certain rights in exchange for payment, and it makes no exceptions for instances of partial or incomplete payment. As the plain language of the text clearly communicates, the § 2002(d)(B)(5) relinquishments are triggered whenever a claimant receives less than the complete compensatory damages awarded, regardless of the relative paucity of the amount received: "Any person receiving less than the full amount of compensatory damages awarded to that party in a judgment . . . shall be required to relinquish rights . . . with respect to enforcement against property that is at issue in claims against the United States before an international tribunal . . . ." VTVPA § 2002(d)(5) (as amended by TRIA § 201(c)(4)). The phrase "less than the full amount of compensatory damages," *id.*, encompasses a payment that is less than the full proportionate share.

Thus, having concluded that the Hegnas' relinquishments were effective upon their receipt of funds on July 30, 2003,

we now turn to the issue of whether the Chicago properties were within the scope of those relinquishments. That is, we consider whether the Chicago properties were "at issue in claims against the United States before an international tribunal." *See* VTVPA § 2002(d)(5)(B) (as amended by TRIA § 201(c)(4)). The United States contends that Iran has filed various claims before the Iran-United States Claims Tribunal at the Hague in regards to the United States' refusal to turn over Iranian consular properties, including the Chicago properties. The Claims Tribunal was established pursuant to the Algiers Accords of 1981 for the purpose of resolving claims of United States nationals against Iran, claims of Iranian nationals against the United States, and certain claims of the United States and Iran against each other. Of particular relevance here is a claim filed by Iran against the United States in 1982, "alleging that the United States had breached its obligations under the Algiers Declarations by failing to grant Iran custody of its diplomatic and consular properties in the United States." *See Islamic Republic of Iran v. United States*, 33 Iran-U.S. Cl. Tr. Rep. 362 (1997), 1997 WL 1175789. In 1994, the Claims Tribunal postponed hearings "until further notice, noting that, pursuant to the Parties' joint submission, if negotiations do not result in a full and final settlement, either party, without the consent of the other party, may request that the Tribunal fix a new date for the hearing." *Id*. (internal citations omitted).

The Hegnas respond that the Chicago properties are not truly "at issue" before the Claims Tribunal because the subject matter jurisdiction of that body is a matter of contention. In their view, because the United States has challenged the Claims Tribunal's subject matter jurisdiction, the status of the consular properties is not actually the subject of the litigation. We are not persuaded by the Hegnas' argument. Regardless of the eventual outcome of the dispute over the Claims Tribunal's subject matter jurisdiction, the lawsuit

filed before that court concerns the United States' obligations under the Algiers Accords to grant Iran custody of its consular properties. It is of no moment that the Claims Tribunal has not yet reached the merits of the underlying dispute.

We conclude that the Chicago properties are at issue before the Claims Tribunal, and that the Hegnas' acceptance of partial payment under VTVPA precludes the Hegnas from attaching those properties in aid of execution of their judgment against Iran. *See* VTVPA § 2002(d)(5) (as amended by TRIA § 201(c)(4)). Having concluded that the Hegnas forfeited any right that they may have had under § 201(a) of TRIA to attach the Chicago properties in aid of execution of their judgment, we need not reach the issue of whether those properties were subject to attachment as "blocked assets" within the meaning of § 201(d)(2) of TRIA.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*