**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE MINISTRY OF DEFENSE AND
SUPPORT FOR THE ARMED
FORCES OF THE ISLAMIC REPUBLIC OF
IRAN, as Successor in Interest to
the Ministry of War of the
Government of Iran,
   *Plaintiff-Appellant,*

  v.

CUBIC DEFENSE SYSTEMS, INC., as
Successor in Interest to Cubic
International Sales Corporation,
   *Defendant,*

  v.

DARIUSH ELAHI,
   *Intervenor-Appellee.*

No. 03-55015

D.C. No.
CV-98-01165-RMB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Rudi M. Brewster, District Judge, Presiding

Argued and Submitted
January 26, 2007—Pasadena, California

Filed May 30, 2007
Amended July 17, 2007

Before: Betty B. Fletcher, Kim McLane Wardlaw, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge B. Fletcher;
Dissent by Judge Fisher

8645

## COUNSEL

David J. Bederman, Law Office of David J. Bederman, Esq., Atlanta, Georgia (argued), Anthony J. Van Patten, Glendale, California, Mina Amassi, Los Altos, California, for the plaintiff-appellant.

Jonathan R. Mook, DiMuroGinsberg, P.C., Alexandria, Virginia (argued), Philip J. Hirschkop, Hirschkop & Assoc., P.C., Alexandria, Virginia, for the intervenor-appellee.

Lewis S. Yelin, Dept. of Justice, Civil Division, Washington, D.C. (argued), Peter D. Keisler, Assistant Attorney General, Carol C. Lam, United States Attorney, Douglas N. Letter, Appellate Litigation Counsel, for United States as amicus curiae.

## ORDER

The opinion filed on May 30, 2007 is amended as follows:

On slip opinion page 6405, footnote 2, line 2, replace the phrase ", not against private parties" with "and counterclaims arising from the same transactions." At the end of that paragraph after "*See* Claims Settlement Declaration . . . http://

www.iusct.org/claims-settlement.pdf" add the following citation: "; *see also* Case A/2, 1 Iran-U.S. C.T.R. 101, Dec. 1-A2-FT (Jan. 26, 1982)."

On slip opinion page 6410, line 19, beginning with "Further, as noted *supra*, the Tribunal has no jurisdiction over claims against private parties" add ", having jurisdiction only to hear counterclaims against such parties."

On slip opinion page 6415, line one, from "Subsequently, President Carter issued Executive Order 12,282 . . ." and ending on line 31 with " . . . revoked or repealed")." delete and replace with the following:

> Following release of the hostages, the United States unblocked most Iranian assets and lifted the trade embargo. *See* Exec. Order Nos. 12,276-12,283, 46 Fed. Reg. 7913-7929 (Jan. 19, 1981); Iranian Assets Control Regulations, 46 Fed. Reg. 14330-14337 (Feb. 26, 1981) (codified at 31 C.F.R. pt. 535). However, military goods such as the ACMR remained blocked. *See* 22 U.S.C. §§ 2751 *et seq.*; Exec. Order No. 12,170, 44 Fed. Reg. 65729 (Nov. 14, 1979); Notice of President, 70 Fed. Reg. 69039 (Nov. 9, 2005); International Traffic in Arms Regulations, 22 C.F.R. §§ 120-30; OFFICE OF FOREIGN ASSETS CONTROL, DEP'T. OF TREAS., FOREIGN ASSETS CONTROL REGULATIONS FOR EXPORTERS AND IMPORTERS 23 (2007) ("Certain assets related to these claims remain blocked in the United States and consist mainly of military and dual-use property").

> The Ministry argues that the Cubic judgment is not a blocked asset under TRIA because Executive Order 12,282 unblocked certain Iranian assets. In support of its argument, MOD cites two cases in which district courts found that TRIA did not permit the attachment of Iranian property because the assets

at issue did not fall within TRIA's definition of "blocked assets." *See Bank of New York v. Rubin*, 2006 WL 633315 (S.D.N.Y. Mar. 15, 2006); *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63 (E.D.N.Y. 2004). However, the reasoning in those cases is inapplicable here. Iran's interest in the properties in question in *Rubin* and *Weinstein* arose after January 19, 1981, so Executive Order 12,282 unblocked those assets. In contrast, Iran's interest in the ACMR arose in October 1977 when Iran executed the contracts with Cubic or at the latest by October 4, 1978 when Iran made a payment of approximately $12,900,000 on the contracts. *See MOD v. Cubic*, 29 F. Supp. 2d at 1170.

With these amendments, Judge Wardlaw has voted to deny the petition for rehearing en banc and Judge B. Fletcher has so recommended. Judge Fisher has voted to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.

The petition for rehearing en banc is DENIED. No further petitions for rehearing or for rehearing en banc may be filed.

---

**OPINION**

B. FLETCHER, Circuit Judge:

This case arises from Dariush Elahi's attempt to collect on a default judgment he holds against Iran. Elahi seeks to attach a $2.8 million judgment obtained in a contract dispute by the Iranian Ministry of Defense and Support of the Armed Forces of the Islamic Republic of Iran. The district court allowed Elahi to attach the judgment, holding that the Ministry had

waived its immunity from attachment by submitting to the jurisdiction of the court. We have jurisdiction under 28 U.S.C. § 1291. For the reasons set forth below, we affirm the district court on the alternative ground that the judgment is subject to attachment under section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, § 201, 116 Stat. 2,322, 2,337 (codified at 28 U.S.C. § 1610 note).

## BACKGROUND

### *The Wrongful Death Default Judgment*

Dr. Cyrus Elahi was shot and killed as he left his apartment building in Paris, France, on October 23, 1990. *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 (D.D.C. 2000). His brother, Dariush Elahi, brought a wrongful death action against the state of Iran and the Iranian Ministry of Information and Security ("MOIS") in the United States District Court for the District of Columbia, claiming Iranian agents assassinated his brother. *Id.* at 97, 100. Although Iran and MOIS did not appear, the court heard testimony and read documentary evidence relating to the assassination;[1] this evidence satisfied the court that Iran and MOIS were liable for Dr. Elahi's death. *Id.* at 100-05, 114. It entered a default judgment against Iran and MOIS for $11.7 million in compensatory damages and punitive damages of $300 million. *Id.* at 115. It is this judgment that Elahi now seeks to satisfy by attaching the Cubic judgment.

### *The Contract Dispute between Cubic Defense Systems and the Iranian Ministry of Defense*

In October 1977, the predecessor of the Iranian Ministry of

---

[1]Before a court may enter a default judgment against a foreign state, the Foreign Sovereign Immunities Act requires that the plaintiff "establish [ ] his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

Defense and Support of the Armed Forces of the Islamic Republic of Iran ("MOD" or "the Ministry") entered into two contracts with an American defense contractor, now known as Cubic Defense Systems ("Cubic"), for the sale and service of an Air Combat Maneuvering Range ("ACMR") for use by the Iranian Air Force. *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc.*, 29 F. Supp. 2d 1168, 1170 (S.D. Cal. 1998). Iran made partial payment on the ACMR, but never received it; following the Iranian Revolution of 1979, Cubic breached its contract with the Ministry and sold the ACMR elsewhere. *Id.* In an attempt to recover the ACMR or its payments, Iran filed a claim against Cubic with the Iran-U.S. Claims Tribunal in The Hague, which was dismissed for lack of jurisdiction.[2] *Id.* Subsequently, Iran requested arbitration before the International Chamber of Commerce ("ICC") in Zurich. *Id.* Having conducted a hearing at which both parties were represented, the ICC issued an award for MOD, ordering Cubic to pay $2.8 million in damages for breach of contract. *Id.* at 1171. The Ministry reduced this ICC award to a judgment ("the Cubic judgment") in the United States District Court for the Southern District of California. *Id.* at 1170-74.

---

[2]The Tribunal is a tribunal of limited jurisdiction. It has jurisdiction only over claims brought against the United States or Iran and counterclaims arising from the same transactions. It may hear the following claims: (1) those brought by nationals of one state against the government of the other, and related counterclaims; (2) intergovernmental claims arising out of contracts for the purchase and sale of goods and services; and (3) intergovernmental claims regarding the interpretation of the Algiers Declarations. *See* Claims Settlement Declaration, Article II, *available at* http://www.iusct.org/claims-settlement.pdf; *see also* Case A/2, 1 Iran-U.S. C.T.R. 101, Dec. 1-A2-FT (Jan. 26, 1982).

The Iran-U.S. Claims Tribunal was created by mutual agreement of Iran and the United States in response to the Iranian hostage crisis and the freezing of Iranian assets by the United States. For more information about the Claims Tribunal and the Algiers Accords, *see* www.iusct.org/background-english.html.

*Elahi's attempt to attach the Cubic judgment*

On November 1, 2001, Elahi sought a lien against the Cubic judgment to satisfy partially his judgment against Iran. MOD filed a motion seeking a judicial determination that the Cubic judgment is immune from attachment by Elahi.[3] Denying the motion, the district court ruled that in waiving its immunity from jurisdiction by submitting to ICC arbitration and seeking confirmation of the arbitration award in district court, MOD had also waived its immunity from attachment of its property. *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc.*, 236 F. Supp. 2d 1140, 1151-52 (S.D. Cal. 2002).

The Ministry appealed, and we affirmed the district court's holding that Elahi could attach the Cubic judgment, although we relied on different grounds. 385 F.3d 1206 (9th Cir. 2004) *vacated and remanded, Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,* 546 U.S. 450 (2006) (per curiam). Relying on the structure and traditional interpretation of the Foreign Sovereign Immunities Act ("FSIA"), we held that the two immunities are separate and that MOD's waiver of jurisdictional immunity did not waive its attachment immunity. *Id.* at 1219. Nonetheless, we affirmed the district court's determination that Elahi could attach the Cubic judgment on the ground that MOD, as an agency of Iran engaged in commercial activity in the United States, fell within a FSIA exception to immunity allowing

---

[3]The Ministry filed a second motion seeking a determination that its judgment was immune from attachment by Stephen Flatow, another judgment creditor. The district court granted the Ministry's motion as to Flatow, and we affirmed. *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Systems, Inc.*, 385 F.3d 1206, 1217 (9th Cir. 2004) *reversed on other grounds as to Elahi by Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi,* 546 U.S. 450 (2006). Because Flatow did not appeal our decision to the Supreme Court, that judgment is not now before us.

attachment of certain property connected to commercial activity. *See id.* at 1219; *see also* 28 U.S.C. § 1610(b).

The Ministry appealed to the United States Supreme Court, which granted certiorari on the limited question of whether MOD constituted a foreign state or an agency or instrumentality of a foreign state. *See Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 546 U.S. 450, 126 S. Ct. 1193, 1194 (2006) (per curiam). Noting that FSIA offers broader immunity from attachment to a foreign state than to a foreign state's agencies and instrumentalities, the Court addressed the question of whether we had properly determined that the Ministry was an agency or instrumentality of Iran rather than the foreign state itself. *Id.* Finding that we had not, the Court remanded for reconsideration. *Id.* at 1195.

On remand, we requested two rounds of supplemental briefing and permitted the United States to appear as *amicus curiae*. As a result of this supplemental briefing, two additional issues have emerged. First, the parties agree that in 2003, Elahi applied for and received payment of $2.3 million from the United States Treasury in partial satisfaction of his $11.7 million compensatory damages award against Iran. In receiving this payment, Elahi signed a declaration in which he relinquished some, but not all, of his rights to pursue the remainder of his default judgment against Iran. Specifically, he relinquished his right to punitive damages and his right to "execute against or attach property that is at issue in claims against the United States before an international tribunal." Office of Foreign Assets Control, Department of Treasury, *Payment to Persons Who Hold Certain Judgments Against Cuba or Iran*, 68 Fed. Reg. 8,077, 8,081 (Feb. 19, 2003); *see also* Victims of Trafficking and Violence Protection Act of 2000 ("Victims Protection Act"), Pub. L. No. 106-386, § 2002(a)(2)(D) (as amended by TRIA, § 201(c)(4)).

The Ministry and the United States both argue that by accepting this payment Elahi waived his right to attach the

Cubic judgment. They contend that the Cubic judgment is currently "at issue" in Claim B/61 before the Iran-U.S. Claims Tribunal in The Hague in which Iran is attempting to recover, from the United States, *inter alia*, any value of the Cubic contracts in excess of the ICC award.

The second new issue is Elahi's contention that he may attach the Cubic judgment under TRIA § 201, which created an alternative avenue of attachment for certain judgment creditors of "terrorist part[ies]."

## DISCUSSION

### 1. Elahi's purported waiver pursuant to his receipt of payment under the Victims Protection Act

In the fall of 2000, Congress directed the Secretary of the Treasury to make available to certain judgment creditors of Iran payments equal to the creditors' compensatory damages awards. Victims Protection Act, § 2002(a)(1). Under this statute, a person is eligible to receive payment for certain judgments against Iran for harms caused by state-sponsored terrorism. *Id.* § 2002(a)(2)(A)(i). Creditors who had filed suit on certain dates were eligible to receive payment, as were those who had received a final judgment by July 20, 2000. *Id.* §§ 2002(a)(2)(A)(i), (ii). Under the terms of the Victims Protection Act, Elahi was not eligible to receive payment.

**[1]** In 2002, Congress amended the Victims Protection Act in several ways, three of which we highlight here. *See* TRIA § 201. First, it expanded the class of judgment creditors eligible to receive payment under the Victims Protection Act to include certain creditors who had filed suit against Iran before October 28, 2000 based on claims of state-sponsored terrorism. Victims Protection Act, § 2002(a)(2)(A)(ii) (as amended by TRIA § 201(c)(1)). This amendment made Elahi eligible to receive payment under the Victims Protection Act, as he had filed suit before October 28, 2000. *See Elahi v. Islamic*

*Republic of Iran*, 124 F. Supp. 2d at 99-100 (noting entry of default judgment on August 14, 2000). Second, based on Congress's recognition of the limited funds available to pay victims with judgments against Iran, the amended Victims Protection Act authorized the Secretary of the Treasury to make pro rata payments on compensatory damages awards. Victims Protection Act, § 2002(d)(1) (as amended by TRIA § 201(c)(4)). Finally, the statute requires a person who accepts a pro rata payment to relinquish certain rights, including the right to execute against or attach "property that is at issue in claims against the United States before an international tribunal" or that is the subject of awards by such tribunal. *Id.* § 2002(a)(2)(D) (as amended by TRIA § 201(c)(4)). Elahi concedes that he waived this right by accepting a pro rata payment under the Victims Protection Act.

Iran has brought a claim against the United States in the Iran-U.S. Claims Tribunal, Claim B/61, for damages based on the non-export of contracted-for goods, including the ACMR that was the subject of the Cubic contract, by United States companies who breached contracts following the Iranian Revolution. Related to the ACMR, Iran contends in its brief to the Claims Tribunal that the $2.8 million ICC award (which became the Cubic judgment) did not fully compensate it for Cubic's non-delivery of goods, and it seeks to recoup the difference from the United States. In that filing, Iran distinguished between the Cubic judgment and its claim before the Claims Tribunal, stating, "[t]he subject-matter of this case, at variance with the ICC action, is the losses suffered by Iran as a result of the United States' non-export of Iranian properties." In other words, the Cubic judgment itself already adjudicated in the ICC action is not "at issue" in Iran's claim that it has not been fully compensated by the United States.

We find this concession persuasive in distinguishing between the contractual obligations resolved through the Cubic judgment and the United States' obligations that will be addressed before the Claims Tribunal. In essence, Claim B/61

addresses what liability the United States incurred by failing to restore frozen Iranian assets, including the ACMR, as required under the Algiers Accords.[4] In contrast, the Cubic judgment had resolved Cubic's liability to Iran for non-delivery of the ACMR.

[2] Nonetheless, Iran argues that the Cubic judgment is "at issue" before the Claims Tribunal because Iran has offered to offset from its demand against the United States in Tribunal Case B/61 any proceeds it receives from the Cubic judgment. This argument ignores Iran's presentation of its claims against Cubic to the ICC and its resulting judgment against Cubic. Having arbitrated this dispute before the ICC and secured a judgment against Cubic for its breach, Iran has fully adjudicated its claim against Cubic for non-delivery of the ACMR. Further, as noted *supra*, the Tribunal has no jurisdiction over claims against private parties, having jurisdiction only to hear counterclaims against such parties.[5] The question of whether Elahi can attach the Cubic judgment is a separate matter from Iran's claim against the United States. Iran's claim against Cubic has been addressed by a tribunal, resolved by the $2.8 million arbitration award against Cubic, and further reduced to a judgment in the Southern District of California.[6]

---

[4]The main commitments of the Algiers Accords were (1) the release by Iran of 52 American hostages; and (2) the agreement by the United States to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979." *See* General Declaration, General Principles, A at 1, *available at* http://www.iusct.org/general-declaration.pdf

[5]*See supra* note 2.

[6]We note that four sister circuits have recently barred claims brought by a family who has accepted payment under the Victims Protection Act, as amended by TRIA, on the grounds that the properties they were attempting to attach were "at issue" before the Claims Tribunal. *See Hegna v. Islamic Republic of Iran*, 402 F.3d 97 (2d Cir. 2005); *Hegna v. Islamic Republic of Iran*, 380 F.3d 1000 (7th Cir. 2004); *Hegna v. Islamic Republic of Iran*, 376 F.3d 485 (5th Cir. 2004); *Hegna v. Islamic Republic of Iran*, 376 F.3d 226 (4th Cir. 2004). Each of those cases presented a factual

**[3]** We hold that the Cubic judgment is not "at issue" before the Claims Tribunal and therefore that Elahi did not waive his right to attach the Cubic judgment by accepting a pro rata payment under the Victims Protection Act.[7]

## 2.  Attachment under TRIA § 201(a)

On remand, Elahi advances the alternative claim that he may attach the Cubic judgment under TRIA § 201(a).[8] We agree that Congress created, in passing TRIA, a method of attachment for creditors such as Elahi who hold final judg-

---

situation, different from the one with which we are confronted, involving properties that had not yet been subject to any judicial determination of liability. Here, the Cubic judgment has been adjudicated and, as Iran concedes in its filing to the Claims Tribunal, is no longer at issue before the Tribunal.

[7]The majority and the dissent interpret differently the breadth of the term "at issue." The majority is guided by the plain meaning of "at issue," which is "under dispute" or "in question." Black's Law Dictionary (8th ed. 2004).

TRIA does not suggest a different conclusion. The dissent reads Congress's choice of the phrase "at issue" as cutting a broader swath than the phrase "the subject of" resolved claims. However, that distinction is untenable. It would embrace both properties as to which any dispute already has been resolved and those currently contested. "At issue" clearly means only those disputed before the Tribunal.

[8]Elahi refers to this claim as one for relief under 28 U.S.C. § 1610(f)(1)(A), as amended by TRIA. We find it clearer to refer to it as attachment under TRIA. TRIA's text does not expressly reinvigorate § 1610(f)(1)(A) from President Clinton's waiver, *see* Pres. Determ. No. 2001-03, 65 Fed. Reg. 66483 (Oct. 28, 2000), despite TRIA's legislative history showing an intent to "build[ ] upon and extend[ ] the principles in section 1610(f)(1) of the Foreign Sovereign Immunities Act," by "eliminat[ing] the effect of any Presidential waiver . . . purporting to bar or restrict enforcement of such judgments, thereby making clear that all such judgments are enforceable against any assets or property under any authorities referenced in Section 1610(f)(1)." H.R. Conf. Rep. No. 107-779 at 27 (Nov. 13, 2002), *reprinted in* 2002 U.S.C.C.A.N. 1430, 1434.

ments for harms caused by terrorism. *See* TRIA § 201(a) (incorporating by reference 28 U.S.C. § 1605(a)(7)).

**[4]** Under TRIA, these creditors may attach "the blocked assets of [a] terrorist party." *Id.* Specifically, TRIA § 201(a) provides:

> (a) In general.—Notwithstanding any other provision of law, and except as provided in subsection (b) [of this note], in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (alteration in original).

**[5]** Elahi's claim for relief under TRIA § 201(a) turns on two factors: (1) whether Iran is a "terrorist party" under that statute and (2) whether the Cubic judgment is a "blocked asset." The first factor is easily answered. TRIA includes within its definition of "terrorist party" a foreign state "designated as a state sponsor of terrorism" by the Secretary of State. TRIA § 201(d)(4). Iran is subject to this definition, having been designated by Secretary of State George Shultz as a state sponsor of terrorism. *See* Secretarial Determ. 84-3, 49 Fed. Reg. 2836-02 (January 23, 1984).

**[6]** We therefore turn to the second factor, whether the Cubic judgment fits within TRIA's definition of a blocked asset. TRIA defines "blocked asset" to mean "any asset seized

or frozen by the United States . . . under sections 202 and 203 of the International Emergency Economic Powers Act [("IEEPA")] (50 U.S.C. §§ 1701, 1702)." TRIA § 201(d)(2)(A). The IEEPA grants the President broad authority[9] to

---

[9] 50 U.S.C. § 1702(a)(1) grants the President the following powers:

(a)(1)   At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A)   investigate, regulate, or prohibit—

(i)   any transactions in foreign exchange,

(ii)   transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii)   the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

regulate foreign assets when faced with "an unusual and extraordinary threat" related to a declared national emergency. 50 U.S.C. § 1701(b). Following the hostage crisis in 1979, President Carter exercised his authority under IEEPA to freeze Iranian assets in the United States:

> I hereby order blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States or which are in or come within the possession or control of persons subject to the jurisdiction of the United States.

Exec. Order No. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979). He delegated to the Secretary of the Treasury his authority under IEEPA to carry out this Order. *Id.* Pursuant to that authority, the Treasury Department issued the Iranian Assets Control Regulations, 45 Fed. Reg. 24,432 (Apr. 9 1980), codified at 31 C.F.R. part 535. Particularly relevant here is 31 C.F.R. § 535.201, which blocked the transfer of goods to Iran:

> No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after [November 14, 1979] Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized.

31 C.F.R. § 535.201 (1980).

Following release of the hostages, the United States unblocked most Iranian assets and lifted the trade embargo. *See* Exec. Order Nos. 12,276-12,283, 46 Fed. Reg. 7913-7929 (Jan. 19, 1981); Iranian Assets Control Regulations, 46 Fed. Reg. 14330-14337 (Feb. 26, 1981) (codified at 31 C.F.R. pt.

535). However, military goods such as the ACMR remained blocked. *See* 22 U.S.C. §§ 2751 *et seq.*; Exec. Order No. 12,170, 44 Fed. Reg. 65729 (Nov. 14, 1979); Notice of President, 70 Fed. Reg. 69039 (Nov. 9, 2005); International Traffic in Arms Regulations, 22 C.F.R. §§ 120-30; OFFICE OF FOREIGN ASSETS CONTROL, DEP'T. OF TREAS., FOREIGN ASSETS CONTROL REGULATIONS FOR EXPORTERS AND IMPORTERS 23 (2007) ("Certain assets related to these claims remain blocked in the United States and consist mainly of military and dual-use property").

The Ministry argues that the Cubic judgment is not a blocked asset under TRIA because Executive Order 12,282 unblocked certain Iranian assets. In support of its argument, MOD cites two cases in which district courts found that TRIA did not permit the attachment of Iranian property because the assets at issue did not fall within TRIA's definition of "blocked assets." *See Bank of New York v. Rubin*, 2006 WL 633315 (S.D.N.Y. Mar. 15, 2006); *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63 (E.D.N.Y. 2004). However, the reasoning in those cases is inapplicable here. Iran's interest in the properties in question in *Rubin* and *Weinstein* arose after January 19, 1981, so Executive Order 12,282 unblocked those assets. In contrast, Iran's interest in the ACMR arose in October 1977 when Iran executed the contracts with Cubic or at the latest by October 4, 1978 when Iran made a payment of approximately $12,900,000 on the contracts. *See MOD v. Cubic*, 29 F. Supp. 2d at 1170.

[7] In sum, we find that the Cubic judgment is a "blocked asset" under TRIA because it represents Iran's interest in an asset "seized or frozen by the United States . . . under sections 202 and 203 of the International Emergency Economic Powers Act." TRIA § 201(d)(2)(A). Because TRIA § 201(a) waives attachment immunity for such blocked assets, we hold that Elahi may attach the Cubic judgment.

### 3.  MOD's status under FSIA

The Supreme Court's remand order asks us to determine the status of MOD. We answer that question although it is relevant only if our determination, either that the Cubic judgment is a blocked asset or that Elahi did not waive his right to attach the judgment under the Victims Protection Act, is in error.

**[8]** All parties agree that, at a minimum, MOD is a "foreign state" for purposes of FSIA and that, as such, its assets would be subject to attachment under the narrow set of circumstances set forth in § 1610(a). The disputed question is whether MOD is an "agency or instrumentality" whose property is subject to attachment under the broader set of exceptions contained in § 1610(b). The answer turns on whether the entity, here the Ministry, is a "separate legal person." 28 U.S.C. § 1603(b).

**[9]** In answering this question, some courts have created a "characteristics" test, asking whether, under the law of the foreign state where it was created, the entity can sue and be sued in its own name, contract in its own name, and hold property in its own name. *See Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 684 (S.D.N.Y. 1996); *Bowers v. Transportes Navieros Ecuadorianos*, 719 F. Supp. 166, 170 (S.D.N.Y. 1989). On the other hand, circuit courts have adopted a "core functions" test, asking whether the defendant is "an integral part of a foreign state's political structure" or, by contrast, "an entity whose structure and function is predominantly commercial." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994) (internal quotation marks and alterations omitted); *see also Garb v. Republic of Poland*, 440 F.3d 579, 594 (2d Cir. 2006); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); *Magness v. Russian Fed'n*, 247 F.3d 609, 613 n.7 (5th Cir. 2001). The United States, in its briefing as *amicus curiae*, urges us to adopt the core functions test.

**[10]** In *Transaero*, the D.C. Circuit considered whether the Bolivian Air Force constitued a part of the Bolivian state or an agency or instrumentality of that state for purposes of service of process under FSIA. Considering FSIA's purpose, the court noted that FSIA codified the "restrictive" approach to sovereign immunity in which immunity is "repealed" for commercial acts and "preserved" for "inherently sovereign or public acts." *Transaero*, 30 F.3d at 151; *accord Republic of Austria v. Altmann,* 541 U.S. 677, 690-91 (2004) (In passing FSIA, Congress's intent was to codify the "restrictive" theory of sovereign immunity, according to which "the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)."). The D.C. Circuit found this "restrictive" approach to support a "core functions" test. Construing narrowly legislative history that would support applying the characteristics test, the D.C. Circuit pointed out that the characteristics test suffered a serious defect: Because "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself," almost any arm of the state would be considered instrumentalities. *Transaero*, 30 F.3d at 151 (noting that under the legislative history test, the United States Departments of State and Defense would count as instrumentalities). We agree. A foreign state is nothing more than the sum of its parts; in other words, like the United States, the state of Iran exists only through its head of state, its ministries, and the myriad administrative offices that collectively embody a sovereign state. More importantly, the foreign state can act only through these entities.

We add that it is illogical to distinguish between a "foreign state" and "agency and instrumentality" on the basis that the latter is a "separate legal person" while the former is not. A central purpose of FSIA was to specify the circumstances under which the federal courts could assert jurisdiction over a foreign state. Thus, the Act *presupposes* that a "foreign state" is capable of suing and being sued. Indeed, in numerous

provisions, the Act explicitly anticipates legal actions brought by or against foreign states. *See* 28 U.S.C. § 1605 (enumerating circumstances in which "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States"); *id.* § 1608 (specifying the manner in which to serve process "upon a foreign state or a political subdivision"); *id.* § 1607 (limiting immunity from counterclaims in "any action brought by a foreign state, or in which a foreign state intervenes"). If the touchstone of an "agency or instrumentality" is whether it can sue or be sued, then these provisions of FSIA become superfluous, thereby undermining the two-tiered scheme of immunity and liability that Congress sought to impose.

[11] We adopt the "core functions" test as the appropriate benchmark for deciding whether an entity should be viewed as a "foreign state" or as an "agency or instrumentality." This analysis has been adopted by each of our sister circuits which has considered the issue, *see Garb,* 440 F.3d at 594; *Roeder*, 333 F.3d at 234; *Magness*, 247 F.3d at 613 n.7, and it is consistent with the purpose and structure of FSIA.

[12] The question thus becomes whether MOD is inherently a part of the political state or a commercial actor. As the D.C. Circuit observed in *Transaero*, "the powers to declare and wage war" are so intimately connected to a state's sovereignty that "it is hard to see what would count as the 'foreign state' if its armed forces do not." 30 F.3d at 153. We find this reasoning persuasive, although we decline to adopt the D.C. Circuit's categorical rule that the armed forces will always be a part of the foreign state itself. *See id.* It is possible to imagine situations in which a state would "subcontract" its defense to paramilitary groups or mercenary forces that would not properly count as part of the state but rather as "separate legal person[s]." However, we adopt a strong presumption that the armed forces constitute a part of the foreign state itself, and that presumption has not been rebutted here.

**[13]** Here, Elahi has presented no evidence that MOD is a "separately constituted legal entity" distinct from the Iranian state. *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba* (*Bancec*), 462 U.S. 611, 624 (1983).[10] He has not established that MOD is "primarily responsible for its own finances," that it is run as a "distinct economic enterprise," that it operates with "independence from close political control," or that it exhibits any of the traits—other than the capacity to sue and be sued—that the Court has identified as characteristic of a "separately constituted legal entity." *Id.* As such, Elahi has failed to overcome the presumption that MOD constitutes an inherent part of the state of Iran.

### A.   *Attachment of the property of a foreign state.*

Although MOD is a "foreign state," Elahi asserts that he may still attach the Cubic judgment under 28 U.S.C. § 1610(a)(7). Under this provision, Elahi must satisfy two conditions. First, his judgment against Iran must "relate[ ] to a claim" brought "against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing." *See id.* (incorporating by reference 28 U.S.C. § 1605(a)(7)). Elahi asserts, and MOD has no choice but to concede, that he has satisfied this requirement. Second, the property in dispute, *i.e.*, the Cubic judgment, must be "property . . . used for a commercial activity in the United States." *Id.* § 1610(a). The parties dispute whether Elahi has satisfied this second requirement.

Section 1610(a) provides that, under certain circumstances, "the property in the United States of a foreign state . . . used

---

[10]We do not imply, by mentioning the *Bancec* factors, that a litigant could overcome the presumption that the armed forces constitute a part of the state through a showing that would satisfy the *Bancec* test for independence of an instrumentality. We expressly decline to discuss what evidentiary showing would suffice to overcome this presumption, since it is not before us on these facts.

for a commercial activity in the United States, shall not be immune from attachment in aid of execution . . . upon a judgment entered by a court of the United States." 28 U.S.C. § 1610(a). Focusing on whether Iran's contract with Cubic constituted commercial activity, Elahi argues that the Cubic judgment was "used for commercial activity in the United States" because it "arose out of MOD's commercial activity." This analysis begs the question. Even assuming the Cubic contract constituted a commercial contract for sale of military goods and services, we are still faced with the question posed by § 1610(a) on the use to which MOD has put the judgment. The source of the property is not determinative and "the mere fact that the property has a nexus or connection to a commercial activity in the United States is insufficient." *Af-Cap Inc. v. Chevron Overseas Ltd.*, 475 F.3d 1080, 1094 (9th Cir. 2007) (internal quotation marks omitted); *accord Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 253 (5th Cir. 2002); *City of Englewood v. Socialist People's Libyan Arab Jamahiriya,* 773 F.2d 31, 36-37 (3d Cir. 1985) (rejecting an argument that property used to house the Libyan ambassador to the United Nations was subject to attachment under § 1610(a) because the property was acquired in a commercial transaction and reasoning that if "acquisition of property in a particular commercial transaction or act indelibly stamped the property as used for commercial activity, even foreign embassies and chancelleries would be subject to execution. Plainly Congress did not intend a result so inconsistent with recognized principles of international law.").

**[14]** To satisfy § 1610(a), MOD must have used the Cubic judgment for a commercial activity in the United States, and this it has not done. We have recently stated that "property is 'used for a commercial activity in the United States' when it is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity." *Af-Cap Inc.*, 475 F.3d at 1091 (emphasis in original). Cautioning that "FSIA does not contemplate a strained analysis of the words

'used for' and 'commercial activity,' " we instructed courts to "consider[ ] the use of the property in question in a straight-forward manner." *Id.* The Ministry has not used the Cubic judgment as security on a loan, as payment for goods, or in any other commercial activity. Instead, Iran intends to send the proceeds back to Iran for assimilation into MOD's general budget. Because repatriation into a ministry's budget does not constitute commercial activity, we hold that the Cubic judgment is not subject to attachment under § 1610(a).

## CONCLUSION

[15] We conclude that although Elahi may not attach the Cubic judgment under § 1610(a), he may do so under TRIA.

The judgment of the district court is **AFFIRMED**.

---

FISHER, Circuit Judge, dissenting:

When Dariush Elahi applied for and accepted $2.3 million from the United States Treasury under the Terrorism Risk Insurance Act of 2002 (TRIA), he relinquished the right to attach property at issue in claims against the United States before an international tribunal. *See* Pub. L. No. 107-297, § 201(d)(5)(B), 116 Stat. 2322, 2339. Iran's Ministry of Defense (MOD), and the United States as amicus curiae, argue that Elahi has relinquished his right to attach the Cubic judgment because it is "at issue" in Iran's Case B/61 before the United States-Iran Claims Tribunal.[1] I agree.

---

[1]Neither party disputes that the United States-Iran Claims Tribunal is an "international tribunal" for purposes of TRIA's relinquishment provision. *See Hegna v. Islamic Republic of Iran*, 402 F.3d 97, 99 (2d Cir. 2005); *Hegna v. Islamic Republic of Iran*, 380 F.3d 1000, 1008-09 (7th Cir. 2004); *Hegna v. Islamic Republic of Iran*, 376 F.3d 485, 492 (5th Cir. 2004).

Case B/61 involves the status and disposition of Iranian military property and assets situated in the United States. One of the pieces of military equipment in dispute in Case B/61 is the Air Combat Maneuvering Range (ACMR), which MOD purchased from Cubic on October 3, 1977. Because Iran has already recovered $2.8 million from Cubic for damages arising out of the 1977 Cubic contract, the United States is entitled to use the Cubic judgment as a setoff against any award in Case B/61.

Although the Cubic judgment will affect the amount of money damages the United States will have to pay, the majority concludes that the Cubic judgment is not "at issue" in Case B/61 and can be attached by Elahi. As a result, the government — if found liable in Case B/61 — will no longer have the benefit of the $2.8 million Cubic judgment that otherwise would be deducted by offset. Because the majority's interpretation of "at issue" contradicts the term's plain meaning and Congress' intent in passing TRIA, I respectfully dissent.

## I.    TRIA's Relinquishment Provision

By enacting TRIA in 2002, Congress expanded the class of judgment creditors eligible to receive payments from the United States Treasury for judgments awarded against "terrorist part[ies]." TRIA § 201(a). Sponsors expressed the hope that TRIA would provide American victims previously denied compensation, such as Elahi, with "some measure of justice." 148 Cong. Rec. S11524-01, 11527 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin).

However, TRIA's justice comes at a cost. Those who receive partial compensation must agree to relinquish the right to execute or attach property "that is at issue in claims against the United States before an international tribunal or that is the subject of awards by such tribunal," TRIA § 201(d)(5)(B), and recipients must sign an agreement stating:

> I hereby relinquish . . . all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal or that is the subject of awards by such tribunal.
>
> I understand that the relinquishment that I make in the event of any pro rata distribution is irrevocable once the payment is credited to the bank account I have identified in this application.

*See* Payments to Persons Who Hold Certain Categories of Judgments Against Cuba or Iran, 68 Fed. Reg. 8077-02, 8081 (Feb. 19, 2003).

When Elahi accepted TRIA funds in April 2003, he knew that he risked waiving the right to attach the Cubic judgment. As early as 2002 MOD argued before the district court that the Cubic judgment "is at issue in Case *B/61* between the United States and Iran in the Hague." *See Ministry of Defense & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 236 F. Supp. 2d 1140, 1146 (S.D. Cal. 2002) (quoting MOD's briefing). Although I am deeply sympathetic to Elahi and his family for their personal loss, relinquishment of the right to attach the Cubic judgment is part of the bargain Elahi struck by accepting funds from the United States treasury.

## II.   Plain Meaning of "At Issue"

This case presents a question of statutory interpretation. As such, the first step is determining "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). For our purposes, the language at issue is "at issue."

When determining the plain meaning of language, we may consult dictionary definitions. *See Af-Cap, Inc. v. Chevron*

*Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007). Black's Law Dictionary defines "at issue" as "[t]aking opposite sides; under dispute; in question." Black's Law Dictionary (8th ed. 2004). Similarly, the American Heritage Dictionary of the English Language (4th ed. 2000), defines "at issue" as "[i]n question; in dispute." It is evident from these definitions that Congress selected a term with a relatively broad meaning. *See Hegna v. Islamic Republic of Iran*, 376 F.3d 485, 492 (5th Cir. 2004) (rejecting narrow interpretation of "at issue").[2]

The Cubic judgment is at issue before the Claims Tribunal because — under any scenario — the Tribunal must determine the effect of the judgment on the amount of liability owed by the United States. Iran has voluntarily pledged to offset the $2.8 million Cubic judgment against any award it wins against the United States in Case B/61. If Iran keeps its promise, that will affect the Claims Tribunal's determination of the amount of damages the United States will have to pay Iran.

Significantly, even if Iran were to renege on its promise, the Cubic judgment would be at issue because the United States could then claim an entitlement to a setoff. Under Claims Tribunal precedent, a defending party may request a reduction of damages where the setoff arises from the same transaction or contract as the underlying claim. *See Computer Sciences Corp. v. Gov't of the Islamic Republic of Iran*, 10 Iran-U.S.C.T.R. 269 (Chamber 1 Apr. 16, 1986). The $2.8 million Cubic judgment — like Iran's underlying claim —

---

[2]Like the majority, my analysis is guided by the plain meaning of "at issue." *See* Op. at 8659 n.7. We part ways because the majority limits the term "property . . . at issue" to property that is the subject of a merits determination before the Claims Tribunal. *See id.* However, an issue is "in question" or "at issue" in a dispute even if it is not the subject of a merits determination. The effect of the Cubic judgment on the financial liability of the United States will be raised and adjudicated; that is sufficient to put the property "in question."

arises from the 1977 contract between Iran and Cubic for the ACMR equipment. Moreover, the United States could also argue that offset is mandated by the doctrine of judicial estoppel. *See Raygo Wagner Equip. Co. v. Iran Express Terminal Corp.,* 2 Iran-U.S.C.T.R. 141 (Chamber 3 Mar. 18, 1983) (finding Iran judicially estopped from asserting that Claims Tribunal lacked jurisdiction where it forwarded inconsistent position before American court).

Because the Claims Tribunal will have to consider the effect of the judgment on any award levied against the United States government, I must conclude that the Cubic judgment is "property that is at issue" before the Claims Tribunal.

### III. Reading the Statute as a Whole

My conclusion is reinforced by reading TRIA as a whole. Because statutory provisions are not written in a vacuum, we should also examine TRIA's purpose and various provisions to understand the meaning of "at issue." *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (en banc). There is no legislative history to guide us, but it is evident from the plain text of § 201 that TRIA's relinquishment provision was intended to prevent victims of terrorism who accept money from the federal treasury from attaching, executing on or making claims against property that might otherwise be used by the United States to satisfy judgments imposed by international tribunals.

Acting on this understanding, other circuits have rebuffed attempts by applicants to attach Iranian property that might become the subject of an award against the United States before the Claims Tribunal. In *Hegna v. Islamic Republic of Iran*, 376 F.3d 226, 235 (4th Cir. 2004), the Fourth Circuit held that a family that accepted payment under TRIA relinquished its right to attach former Iranian diplomatic properties located in Bethesda, Maryland. The court held that such properties were "at issue" before the Claims Tribunal because Iran

filed claims against the United States alleging that the federal government unlawfully "fail[ed] to grant Iran custody of its diplomatic and consular properties in the United States." *Id.* (citation and internal quotation marks omitted). Because Iran's claim remained pending before the Claims Tribunal, the court concluded that "it would appear rather straightforward that the Bethesda properties fall within the contours of the Hegnas' relinquishment." *Id.* In short, had the Hegnas succeeded in effecting the sale of the properties to satisfy the balance of their judgment against Iran, the United States would then have had to compensate Iran for the value of those properties (if found liable to Iran), in effect covering the funds paid to the Hegnas through their attachment. This is the very result Congress intended to avoid through the relinquishment proviso.

Although Elahi's attachment involves cash rather than buildings, adherence to legislative intent results in the same outcome. Having already received TRIA funds from the United States treasury, Elahi should not be permitted to attach property that might otherwise be used to satisfy a judgment against the United States. As in *Hegna*, the only way to effectuate congressional intent is to prohibit Elahi from doing so.

## IV.   Iran's "Concession"

Although the majority's interpretation of "at issue" contradicts plain meaning and congressional intent, the majority is "persua[ded]" to hold in favor of Elahi because Iran "conceded" in briefing to the Claims Tribunal that the Cubic judgment and Case B/61 do not share identicality of subject matter. Op. at 8657-58. There are convincing reasons to be persuaded otherwise.

In its briefing to the Claims Tribunal, Iran argued against giving res judicata effect to the ICC's adjudication of its claim against Cubic because:

[the ICC's] case and the present one lack three identities (identity of object, identity of parties, and identity of subject matter) required for that purpose. The object of this litigation, unlike that in the ICC lawsuit, is the United States' obligation under the Algiers Declarations to arrange for the transfer of the items to Iran. The opposing party in this Case is, obviously not a U.S. private company, but the United States' Government. The subject-matter of this Case, at variance with the ICC action, is the losses suffered by Iran as a result of the United States' non-export of Iranian properties.

However, Iran's argument concerned the equitable doctrine of res judicata and therefore has little bearing on this court's exercise in statutory interpretation. Even if Iran were correct that the subject matter of Case B/61 is at variance with the ICC arbitration, it does not follow that the Cubic judgment is not at issue in Case B/61. "At issue" is not synonymous with identity of subject matter, a distinction that Congress clearly understood when it drafted TRIA.

TRIA's relinquishment provision prohibits applicants from attaching two different types of property: (1) property that is "*the subject of*" *resolved* claims before an international tribunal; and (2) property that is "*at issue*" when claims remain *pending*. "[T]he use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *Sec. & Exch. Comm'n v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003). By using the conceptually broader term "at issue," it is evident that Congress did not intend to limit the relinquishment provision strictly to property that is *the subject of* a pending claim before the Claims Tribunal.

Thus, the majority's rationale that the Cubic judgment is not at issue because Case B/61 addresses the federal government's liability for failing to restore frozen assets (including

the ACMR), whereas the Cubic judgment reflects Cubic's liability for the non-delivery of the ACMR, is wide of the mark. *See* Op. at 8658. The majority's observation is, of course, accurate but not dispositive of the relinquishment analysis. Because MOD's claim against the United States is still pending, the relevant question is not whether the Cubic judgment and Case B/61 share the same parties, causes of action or even the same "subject," but whether the Cubic judgment is "at issue" or "in question" in Case B/61. Because the Claims Tribunal will have to consider the impact of the Cubic judgment on the amount of liability owed by the United States, the answer to that question is yes.

By relying so heavily on Iran's argument — made in a different context to another tribunal — the majority rests its analysis on a shaky foundation. TRIA itself — its text and purpose — offers much firmer ground for an exercise in statutory interpretation. Adherence to established doctrines of statutory construction leads to the conclusion that Elahi relinquished his right to attach the Cubic judgment. I therefore respectfully dissent.